No. 47,653

STATE OF KANSAS, *Appellee,* v. ROBERT B. CLARK, *Appellant.*

(542 P. 2d 291)

Opinion filed November 8, 1975.

*Ronald K. Badger,* of Wichita, argued the cause, and *Cortland Q. Clotfelter,* also of Wichita, was with him on the brief for the appellant.

*Stephen Joseph,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, and *Keith Sanborn,* district attorney, were on the brief for the appellee.

The opinion of the court was delivered by

OWSLEY, J.: Defendant, Robert B. Clark, appeals from a conviction of voluntary manslaughter (K. S. A. 21-3403)˙ stemming from the fatal shooting of his wife, Julia. We are reversing the judgment of the trial court and remanding the case for a new trial for error in the instructions and error in the admission into evidence of prejudicial photographs.

Robert and Julia Clark were married on June 23, 1972. It was Robert's second marriage, his first having ended in divorce. His first wife, Val, returned to her former home in Germany after their divorce, along with their two minor children.

Robert's prior marriage and his children by that marriage proved to be a major problem from the outset of his romance with Julia.

Julia had extreme difficulty in accepting the fact he had been married before and she became very upset at any mention of his former wife or his children. The couple began consulting with Dr. Roy B. Henderson, a clinical psychologist, several months prior to their marriage, and continued seeing him on a regular basis after their marriage until the time of Julia's death on December 22, 1972. Dr. Henderson testified that both parties had adjustment problems, and in his words, "It is just a constant problem every time Val came into the picture." He had discussed the subject of divorce with Julia several weeks before her death. He also testified that Robert and Julia had threatened each other with guns on several occasions and he had counseled with them, both in his office and by telephone, concerning such dangerous "gun play." He considered the problem serious enough that he consulted with their referring physician about it, but he finally decided the couple was mature enough that they should be allowed to keep their guns. One night prior to Thanksgiving, Dr. Henderson received three telephone calls from them. On the first two calls Julia told him Robert had one gun pointing at her and one pointing at himself. On the third call Julia had a gun pointing at Robert, and Robert had one pointing at her.

In Dr. Henderson's opinion, Julia was a very emotional and insecure person who "functioned more like a hysterical individual." He characterized Robert as a "very conscious individual who probably has excessive compulsive features in his personality." He felt they contributed equally to the problems of their marriage.

In April of 1972, Robert purchased a .32 caliber revolver and a .357 Magnum pistol when he applied for a position as a security guard. After a disturbance in the hallway of their apartment frightened Julia, Robert kept both guns loaded and placed the .32 caliber revolver in the credenza next to the bed and the .357 pistol under the bed.

On December 22, 1972, the day of the tragedy, Robert purchased a television set for Julia as a Christmas present and placed it under the tree. Later that afternoon he received a package in the mail from his former wife and children in Germany, but he did not open it since he had an agreement with Julia that he would only open letters and packages from Germany in her presence. Shortly after returning home from picking up Julia at work, they opened the package together. Robert testified that when they saw the package

contained tapes and some shaving lotion, Julia insisted the tapes be played. When she heard the voices of his children on the tapes she became extremely upset. While he was trying to repair the tape player, Julia received a telephone call from an old friend, Sharon Hunter. Miss Hunter testified that Julia was in a hurry, but that she did not seem to be upset.

Julia then went to the bedroom where she called her mother to tell her she was going to get a divorce and wanted to know the name of an attorney. According to her mother's testimony, Julia sounded calm and unemotional over the telephone. A few minutes later, Robert went into the bedroom and sat down on the side of the bed. Julia had finished her conversation with her mother and had left the bedroom. Robert testified that he was "pretty upset" and he thought he was holding his head in his hands when he heard Julia behind him saying something to the effect of, "I have had it with you and those d—— kids and that s—— from Germany." He was "rather startled" by this and when he turned around, he saw Julia pointing a gun at him. His account of what transpired next is as follows:

"A. Well I flat panicked. I always taught Julie not to mess with guns, ever point them at anybody.

"Q. What did you do?

"A. I was scared, I was afraid. She didn't know how to handle them. That gun could go off at any time. All I saw was gun. I didn't see Julie any more. It was somebody pointing a gun at me and I was afraid.

"Q. What did you do?

"A. I dropped down to the floor and automatically reached under the bed for the gun I had under there and I just panicked, just panicked.

"Q. Did Julie's gun go off?

"A. Yeah, about the time I reached down and dove for my gun why I heard a loud explosion. I don't know where the bullet went or anything and from there on I don't remember very much.

"Q. You do remember going for your gun?

"A. Yes, sir, I do.

"Q. You remember pulling the trigger?

"A. No, and with a gun that size, it—I've never fired that gun. That gun's never been fired before. I fired a smaller caliber. It is practically an exact replica of that gun and they do have a kick but I do not remember that gun going off in my hand. I do not remember any of the sounds of it. No recoil, anything.

"Q. What's the next thing you remember?

"A. Next thing I was down here approximately in here at the end of the bed and I don't know what happened. Some kind of noise or something I looked down and I have this gun in my hand and I looked over and Julie was on the floor and I threw the gun over on the bed and I rushed towards Julie."

When Robert saw that Julia was still breathing he immediately called for the police and an ambulance. A police dispatcher later confirmed the fact that defendant called the police and said he had just shot his wife. Robert also called Dr. Henderson and told him he had just shot Julia.

When the police arrived at the apartment Robert was still talking on the phone to Dr. Henderson and he offered no resistance. One bullet was found in the ceiling of the bedroom and the body of the decedent had three gunshot wounds. The arresting officer detected a moderate smell of alcohol on the breath of defendant.

Defendant was charged by information with the offense of second degree murder (K. S. A. 21-3402), the state's theory being that the defendant intentionally and with malice fired three rapid shots at the deceased as she was leaving the bedroom. The jury, however, returned a verdict of guilty as to the lesser included offense of voluntary manslaughter.

Defendant raises six points of error in his appeal, but in view of our disposition of this case we will only discuss the two points which we believe rise to the level of prejudicial error.

First, defendant contends the trial court erred in failing to give an instruction on involuntary manslaughter (K. S. A. 21-3404), as a lesser included offense of the charge of second degree murder. We have emphasized that evidence of a lesser offense need not be strong or extensive, as long as the evidence presents circumstances from which such lesser offense might reasonably be inferred; and the unsupported testimony of the defendant alone, if tending to establish such inferior degree, is sufficient to require the court to so instruct. (*State v. Clark*, 214 Kan. 293, 521 P. 2d 298; *State v. Booker*, 200 Kan. 166, 434 P. 2d 801; *State v. Buffington*, 66 Kan. 706, 72 Pac. 213.)

In line with these authorities we must determine whether there was sufficient evidence to support an instruction on involuntary manslaughter. That offense is defined by K. S. A. 21-3404 as follows:

"Involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner. As used in this section, an 'unlawful act' is any act which is prohibited by a statute of the United States or the state of Kansas or an ordinance of any city within the state which statute or ordinance is enacted for the protection of human life or safety."

Before requiring an instruction on involuntary manslaughter as

a lesser included offense, there must be some evidence tending to establish each of the four elements of that crime: (1) an unlawful killing (2) without malice (3) done unintentionally (4) while committing either (*a*) an unlawful act not amounting to a felony, or (*b*) a lawful act in an unlawful or wanton manner. Here, there is no question there was an unlawful killing of the decedent since defendant admitted he shot her. Equally clear is the fact there was sufficient evidence from which the absence of malice could be inferred.

The state contends, however, that there is no evidence in the record to show the killing of defendant's wife was unintentional. The state points to defendant's account of the shooting and his testimony that he could not remember the shooting. It argues this was not direct evidence that he did not intend to kill his wife, only that he had no recollection of pulling the trigger or actually shooting her.

Although we concede the evidence of an unintentional killing is weak and inconclusive, we believe defendant's testimony alone was sufficient to raise a legitimate issue for proper consideration by the jury. As previously noted, defendant testified he was startled when he turned around and saw his wife pointing a gun at him and he "panicked." Some significance can be attached to the fact these parties had pointed guns at each other on several other occasions without fatal consequences. Although defendant admits shooting his wife, he claims no knowledge of pointing the gun at her or of pulling the trigger. The only direct testimony as to what occurred prior to the shooting is necessarily limited to defendant's account. If defendant is believed, the jury could find that he blacked out temporarily and was not fully aware of what he was doing. We believe the jury might possibly have inferred from defendant's account of the incident that he did not intend to kill his wife.

Both defendant and the state discuss the issue of whether the evidence is sufficient to support alternative (*a*) of the fourth element of involuntary manslaughter; that is, under the facts related by defendant, he committed "an unlawful act not amounting to a felony." Although the parties stressed this point, we believe the issue of whether an instruction on involuntary manslaughter should have been given can be more clearly and satisfactorily solved by turning to alternative (*b*) of the fourth element. The issue then becomes whether, under the facts before the trial court, defendant

committed "a lawful act in an unlawful or wanton manner." In order to answer this question we must consider defendant's claim of self-defense. The common law principle of self-defense is codified in K. S. A. 21-3211. It provides that any conduct is lawful which is necessary to repel an aggressor's imminent use of unlawful force. It is apparent that reasonable minds might differ as to the point when conduct necessary to repel an aggressor ceases. From the evidence in this case it could be determined that defendant was justified in drawing and pointing the gun in self-defense, thus creating the lawful act required by the statute. It could also be determined that if the gun was discharged in the manner described by defendant, its discharge could be the result of unlawful or wanton conduct as required by the statute.

It is not the function of this court to determine whether the foregoing factual possibilities should prevail. It is our function to exercise our judicial judgment as to whether there was sufficient evidence in the record to necessitate an instruction on involuntary manslaughter. We have therefore concluded the evidence was sufficient to support a jury verdict of involuntary manslaughter and the trial court erred in not instructing thereon.

Defendant further complains the trial court erred in admitting certain photographs of the deceased taken at the autopsy. He contends these photographs were unduly grotesque, irrelevant, and inflammatory. As a general rule, exhibits which are relevant and material to matters in issue are not rendered inadmissible merely because they may be shocking or gruesome. (*State v. Campbell,* 210 Kan. 265, 500 P. 2d 21.) In *Campbell,* we noted that even if the defendant concedes the victim's death and the cause, the state has the burden of proving all the elements of the crime charged, and photographs offered to prove the elements of the crime or to corroborate the testimony of other witnesses are still admissible.

In the recent case of *State v. Boyd,* 216 Kan. 373, 532 P. 2d 1064, we dealt with the admissibility of autopsy photographs supposedly offered by the state to show the manner and cause of death. We stated that the admission of photographs is generally within the discretion of the trial court. Our statements in that opinion are applicable to the facts of the instant case:

". . . We believe, however, that exhibit 39 was so gruesome and repulsive that the trial court abused its discretion in admitting that exhibit into evidence. In our opinion the offer of this exhibit could be but for a single purpose—to inflame the minds of the members of the jury. This court has

gone a long way, perhaps too far, in countenancing the introduction of grisly, gruesome photographs. Here exhibit 39 shows the body of the deceased cut open from chin to groin and laid out like a disemboweled beef in a packing plant. A flap of chest skin partially covers the deceased's face and the chest and abdominal organs of the deceased are presented in full view. In this case the cause of death of the victim was really not in dispute. The state's medical expert made it clear that death was due to internal bleeding resulting from stab wounds. Some of the photographs which were admitted could have been helpful to the jury by showing the angle of penetration of the murder instrument into the deceased's body. We fail to see the necessity, however, of the state's offering repetitious exhibits to prove the same point. . . ." (pp. 377, 378.)

In the instant case the state introduced the majority of the photographs objected to by defendant for the alleged purpose of demonstrating the flight path of the bullet through the deceased's body. Yet, upon examining the record we find six of the admitted photographs were not used for any purpose. Although evidence of autopsy photographs may properly be admissible to show the flight path of the bullet through the deceased and thereby weaken defendant's claim of self-defense, we cannot approve the wholesale admission of similar grotesque and bloody photographs which add nothing new to the state's case. We conclude the trial court abused its discretion in admitting into evidence certain autopsy photographs of the deceased and defendant was prejudiced thereby.

The judgment of the trial court is reversed and the case is remanded for a new trial.

MILLER, J., not participating.