No. 79,986

STATE OF KANSAS, *Appellee*, v. GARY J. BELL, SR., *Appellant*.
(975 P.2d 239)

Opinion filed March 5, 1999.

*Craig H. Durham*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the briefs for appellant.

*Doyle Baker*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: The defendant, Gary J. Bell, appeals from his conviction and life sentence for second-degree murder. He contends that the trial court failed in its duty to instruct on lesser included offenses raised by the trial evidence. He also argues that supplemental instructions given outside his presence require reversal. We conclude no reversible error occurred and affirm.

## Facts

The defendant was charged with the second-degree intentional murder of Paul Madden, who died from multiple gunshot wounds inflicted by the defendant about noon on February 27, 1997. The shooting occurred while the victim was in his truck in front of the Taylor Food Mart (Taylor Mart), a convenience store in Cheney. The victim suffered five separate gunshot wounds: a wound to the left shoulder, from the left to right side on an upward angle; a

wound to the upper left back which perforated the heart and came out through the front of the chest; a wound in the left middle of the back through the abdomen, left kidney, heart, and spleen, with the bullet coming to rest in the left chest; a wound directly left to right through the side of the body into the spine; and a wound to the right hand.

The State's theory at trial was that the defendant acted out of jealousy because his former wife had recently moved in with the victim. The defendant claimed that his first shot was an act of self defense, that he blacked out after the first shot, and that he did not intend to kill the victim. Other than the defendant's testimony at trial, the record fails to support his version of what occurred in front of the Taylor Mart. Moreover, his trial testimony of what occurred differed significantly from what he told the police shortly after the shooting.

Stella Bell met and married the defendant in 1982. At the time of the shooting, Stella was 35 years old and the defendant was 53. They had one child of the marriage, Jeremy, who was 11 at the time of trial, and Stella had two other children, Brad, 15, and Rocky, 17.

The Bells moved to Kansas in 1986 and started a restroom cleaning business called Odor Masters. According to Stella, she and the defendant divorced in 1993 because the defendant was very controlling, and also because the defendant was in poor health and, therefore, she was doing all the work in the business. Soon after the divorce, Stella, the children, and Stella's mother began living in a trailer behind the defendant's house outside of Kingman. Stella moved back in with the defendant by 1994, and by 1996 they had moved into a house in Kingman.

Stella testified that by February 1997, she had decided to leave the defendant. Their business was failing and the house was subject to a sheriff's sale. Stella was working at the Taylor Mart in Cheney. The couple had recently had a disagreement regarding Jason Morris, a 20-year-old who frequented the Taylor Mart. Jason and Stella had become friends as the result of his 2 to 3 visits per day to Taylor Mart, and their friendship had advanced to the point where Jason had kissed Stella. However, the defendant had informed Ja-

son that he and Stella were still married by common law and that Jason should stop going to the Taylor Mart.

The events leading up to the shooting began on Saturday, February 22, 1997. Stella testified that the defendant drove her and their son Jeremy to Garden Plain to look at trailers for herself and the children. A friend of Stella's, Jeanni Miller, worked at Champs Bar in Cheney, and Stella was going to go to Cheney that evening to eat with her. Stella stated that the defendant became upset because he felt that he was not invited to go with Stella. According to Stella, she did not know why the defendant was getting upset because the defendant, Stella, and the children usually went to Champs on Saturday night.

They arrived at Champs and the defendant jumped out and went in. Jason was inside playing pool. The defendant became angry and called Jason outside. Stella began arguing with the defendant. The defendant kept asking her if she was having an affair with Jason. Finally, although it was not true, she stated to him, "Yeah, you're right, I'm having sex with Jason." The defendant then told Stella to "have a nice life," got in the van, and left.

Stella and Jeremy both went into Champs and ate. They then walked down the street to the house of the victim, Paul Madden, to use the telephone. Stella testified that she had become friendly with Madden as the result of his visits to the Taylor Mart and admitted that she and Madden had previously discussed having a relationship, but that she had asked Madden to back off because she wanted to work on her marriage with the defendant.

Madden told Stella that she and the children could stay at his house until she found a place to live. Stella made telephone calls to locate her two other sons but could not. That night, Stella and Madden slept in the bed and Jeremy slept on the couch, although Stella testified that she and Madden did not have intercourse that night.

Stella went to work Sunday morning. The defendant came into the store that afternoon and asked her to come home. Stella did not tell the defendant where she was staying but, instead, told the defendant only that Jeremy was staying with Jeanni Miller.

Early Monday morning, Stella received a call from the defendant at Madden's house. The defendant wanted to know why Stella was not at work. When Stella told the defendant that she had overslept and needed to call her boss to let him know, the defendant told Stella not to worry as he was already at the Taylor Mart and would tell her boss that she was on her way.

Prior to having Madden drop her off at work, Stella called Police Chief H.D. Lubbers. Chief Lubbers agreed to meet her at the Taylor Mart to avoid trouble. She did not know at that time that the manager of the Taylor Mart, fearing a disturbance because the defendant was there, had already called for police. Officer Terry Tompkins testified that when he arrived at the Taylor Mart at approximately 7:55 a.m., the defendant was inside. The defendant told Officer Tompkins that he had been upset but that he was not going to cause trouble. Madden then pulled up to let Stella out and the defendant began walking out, stating to Officer Tompkins, "You don't mind if I go out and shake this man's hand, do you?" to which Tompkins replied: "Yes, I do. Gary, we're not going to do this." At that point, Madden drove away and Chief Lubbers pulled up.

Chief Lubbers asked the defendant what was going on. He told the defendant that it was not a good idea to pursue Stella if Stella did not want him. The defendant promised not to cause trouble and left. Later that afternoon, the defendant again came into the Taylor Mart. According to Stella, the defendant was despondent about bills that needed to be paid. At one point, the defendant pulled out a gun and put it in his mouth saying, "I'll end it all right here and that way there won't be no problems." Jeremy was in the store when he did this. Stella at that time gave the defendant three money orders to cover the bills.

On Tuesday, Stella and Madden took Stella's three boys to enroll them in the Cheney schools and they went to Kingman to get the boys out of school. They were at the middle school when the defendant came in and confronted them saying that he wanted to talk to Madden and tell him that Stella slept with everybody and spent money like crazy. Stella told the defendant not to make a scene

and that he did not need to talk to Madden. She agreed to go to the defendant's house and pick up her belongings.

Madden, Stella, Bradley, and Jeremy went to the house and loaded up Stella's belongings. The defendant kept insisting that he wanted to talk to Madden and tell him what a lowlife person Stella was and how he lifted Stella out of the gutter. According to Stella, as she and Madden were leaving, the defendant begged Stella to come home, saying that he still loved her. Rocky Bell testified that the defendant told him after Stella and Madden left that he had been controlling himself not to shoot Madden.

The next day, Wednesday, the defendant brought papers to the Taylor Mart relating to Stella's son Rocky. Again, the defendant asked Stella to come home. He also attempted to kiss her. Stella testified that on that night, she and Madden decided to be a couple and were intimate "to a certain point." Rocky Bell testified that on Wednesday night, the defendant put his .38 pistol in his mouth and threatened to shoot himself.

Thursday, the day of the shooting, the defendant showed up at the Taylor Mart for the beginning of Stella's shift at 6:00 a.m. The defendant stated that he needed to make telephone calls in an attempt to sell his boat which had been sitting outside of the Taylor Mart with a "for sale" sign on it. He also wanted Stella to fill out an insurance application for him so that he could get his bail bondsman's license. The defendant waited until 8:00, at which time Madden brought the boys into the store before they went to school. The defendant talked to the boys and then Madden left. The defendant continued to stay at the store and then finally left to mail his insurance application. Stella received a telephone call from the postmaster stating that the defendant wanted to pick up the mail for the Taylor Mart. She told the postmaster to let the defendant have the mail.

At approximately 11:40, the defendant left the Taylor Mart. Around that time, Madden called Stella and offered to bring her lunch. Madden was going to stay and eat with Stella but saw that the defendant was again driving into the parking lot. Stella told Madden to just go home.

According to Stella, Madden walked to his truck. The defendant stood at the door to the Taylor Mart and then started walking over towards Madden's truck. Stella ran out of the Taylor Mart and saw the defendant standing at the window of Madden's truck. Stella then said to the defendant, "Why are you doing this? Why can't you just leave the man alone? He has nothing to do with this. It's over and you know it's over." By this time, Madden had put the truck in reverse. The defendant turned to Stella and stated, "But he's done killed me," and pulled out a gun. Stella stated that she cried out for the defendant to put the gun away, heard a noise, and suddenly the truck window was gone. The defendant repeatedly fired the gun as Stella jumped on his back and attempted to knock the gun away. Stella testified that she thought she heard five shots. Stella then ran back into the store.

There were other witnesses to the shooting. Carol Brozek, a customer at the Taylor Mart, stated that she saw the defendant walk towards Madden's truck and saw Stella go out to attempt to talk to the defendant. Brozek stated that she heard Stella tell the defendant that nothing was going on between Madden and herself. Then, according to Brozek, the defendant suddenly reached into the truck at Madden, the glass broke, and she saw Stella jumping onto the defendant's back. Brozek then turned to her mother-in-law who was also inside the store and stated, "There's going to be a fight." She then heard a gunshot. She thought that she heard six shots altogether.

Wayne Castor, a disabled police officer, was also in the Taylor Mart at the time. He testified that while Stella was talking to the defendant, she shoved the defendant. The defendant then shoved Stella, pulled out a gun, and fired into the cab of Madden's pickup. According to Castor, Madden's hands were on the steering wheel of the pickup during this time. Castor testified that the defendant raised his hands above the window and fired at a downward angle numerous times. The defendant then left in his van only to return to the scene almost immediately.

Police Chief Lubbers responded to a 911 call from the Taylor Mart. He asked the defendant where the gun was. The defendant directed him to the passenger seat of his van where Lubbers re-

trieved a Charter Arms 38 Special revolver with five expended shells. A search of the van also turned up a 30-06 rifle and a 9 mm semi-automatic pistol, along with numerous rounds of ammunition. A search of the victim's truck revealed no weapons.

## The Defendant's Version

The defendant testified that on the day of the shooting, he got up early and went to Cheney to try to talk to Stella again. He realized he was "making a pain" of himself but hated to give up on his relationship with Stella. He stayed at the Taylor Mart that morning and talked to customers while Stella did her reports. He then helped Stella with the reports and also with some other things around the store.

The defendant testified that he planned to talk to people in Wichita about selling his boat. He also planned to sell his 30-06 deer rifle and his 9 mm semi-automatic pistol, and he had both of those firearms in the van. During the morning, he called a marina regarding selling his boat, then after 10 a.m. he went to the post office to mail his insurance application so that he could continue with his plan to become a bail bondsman. At around 11:00, he went to the marina and made plans to bring his boat there to be sold. He then headed back to the Taylor Mart to get the boat. On the way back, he remembered that Stella had been talking to Police Chief Lubbers about a trailer she wanted to rent and the defendant decided to help out Stella by talking to Lubbers about whether the trailer was still available. He stopped in at Lubbers' house and asked Lubbers about the trailer. He also noticed some apartments in town for rent and wrote down the numbers for Stella.

The defendant testified that he pulled in to the Taylor Mart parking lot and saw the victim's truck. He decided to sit there for a few minutes to give Madden some time with Stella. He then walked to the door to tell Stella about the boat, the apartments, and the trailer for rent. He got to the door just as Madden was coming out. He decided to talk to Madden and went to Madden's truck. The defendant testified that he told Madden about the trailer, but Madden informed him that Stella was not going any-

where. This confused the defendant, who had been under the impression from Stella that the defendant and Stella could still date.

Stella then came out of the Taylor Mart upset and yelling, "Don't talk to him. I don't want you talking to him. This has nothing to do with him. This has nothing to do with sex. Just get away and leave." The defendant testified that Stella began pushing and shoving him and that he stated, "Stella, this is killing me." Stella then looked at him and said, "He's got a gun." Thinking that she meant Madden had a gun, the defendant turned around to see Madden leaning over towards the passenger side of the pickup. The defendant stated that he shoved Stella out of the way and saw Madden with something in his right hand. The defendant pulled out his gun and shot at Madden's hand. The shot broke the window of the pickup. The defendant stated that the next thing he remembered was the click of the empty gun. He then remembered leaning against his boat and seeing Police Chief Lubbers. At the time, he did not realize that he had killed Madden.

The defendant's trial testimony differed in key respects from the statement given at the police station some time after the shooting, and after defendant had been properly warned of his *Miranda* rights. In his statement he did not tell the police that he thought Madden had a gun, did not say anything about Madden leaning forward in the front seat, did not say anything about Madden having anything in his hand, and did not tell the police that he heard Stella say anything about a gun. He did recall Stella saying something but could not remember what she said. The defendant admitted on cross-examination that he wrote a letter to Stella from jail which stated: "I loved you so much that I would have done anything for you; and I did, didn't I?"

The jury was instructed on second-degree murder and self defense, as well as the lesser included offense of voluntary manslaughter under a theory of unreasonable but honest belief that force was necessary. The defendant requested an additional instruction on voluntary manslaughter under a heat of passion theory but did not request any instructions on involuntary manslaughter. During jury deliberations, the jury sent a note to the court stating that they needed more information in regard to the instruction on

second-degree murder. The trial court called the prosecutor, the defendant, and his attorney to discuss this request. Defense counsel objected to the giving of any additional instructions. However, outside the presence of the defendant and counsel, the court prepared a written instruction and sent it to the jury.

The defendant raises four errors, all of which deal with either the trial court's failure to give instructions or the manner in which instructions were given. The first two concern the defendant's contention that the trial court was duty bound under the facts to instruct the jury on involuntary manslaughter. He claims that the evidence raises the question of whether his actions were intentional, thus, necessitating an instruction on unintentional killing or involuntary manslaughter. He also claims that the evidence tends to establish that his actions were lawful in that he was acting to defend himself or another but that this may have been done unlawfully because of excessive force.

The defendant also claims that the trial court should have instructed on voluntary manslaughter based upon evidence in the record as to sudden quarrel. Finally, he claims that the manner in which the court gave a supplemental instruction to the jury during its deliberations violated his constitutional right to be present at all critical stages of the trial.

## Discussion and Analysis

### Trial Court's Duty to Instruct

A trial court's duty to instruct on a lesser included offense supported by the evidence exists whether or not the defendant requests the instruction at trial. *State v. Sanders*, 258 Kan. 409, 413, 904 P.2d 951 (1995). The duty arises when the evidence as a whole, viewed in the light most favorable to the defendant, would justify a jury verdict on the lesser included offense. *State v. Moncla*, 262 Kan. 58, 74, 936 P.2d 727 (1997). No such duty exists where the evidence as a whole, viewed in the light most favorable to the defendant could not reasonably support a jury verdict on the lesser included offense. See *State v. Robinson*, 261 Kan. 865, Syl. ¶ 7, 934 P.2d 38 (1997).

## Duty To Instruct In This Case On Involuntary Manslaughter

The defendant contends that the trial court should have instructed on involuntary manslaughter as set forth in K.S.A. 1997 Supp. 21-3404(a) and (c), which provides: "Involuntary manslaughter is the unintentional killing of a human being committed: (a) Recklessly; . . . (c) during the commission of a lawful act in an unlawful manner." The defendant argues that his testimony alone required the trial court to instruct on involuntary manslaughter because the evidence suggested an unintentional but reckless killing and also suggested a lawful act of self defense done in an unlawful manner with excessive force. He bases his arguments upon *State v. Gregory*, 218 Kan. 180, 542 P.2d 1051 (1975), and *State v. Clark*, 218 Kan. 18, 542 P.2d 291 (1975); as well as *State v. Seelke*, 221 Kan. 672, 561 P.2d 869 (1977); *State v. Childers*, 217 Kan. 410, 536 P.2d 1349 (1973); *State v. Mitchell*, 23 Kan. App. 2d 413, 932 P.2d 1012 (1997); and *State v. Warren*, 5 Kan. App. 2d 754, 624 P.2d 476 (1981). In each of the above cases, there was trial testimony by the defendant bearing upon the duty of the trial court to instruct.

The State argues with equal force that *State v. Staab*, 230 Kan. 329, 635 P.2d 257 (1981); *State v. [Cain] Dixon*, 248 Kan. 776, 811 P.2d 1153 (1991); *State v. Hickles*, 261 Kan. 74, 929 P.2d 141 (1996); and *State v. [Elbert] Dixon*, 252 Kan. 39, 843 P.2d 182 (1992), support a conclusion that the trial evidence did not raise a duty of the trial court to instruct on the defendant's theories of involuntary manslaughter. In each of the cases relied on by the State, there was also trial testimony by the defendant bearing upon the duty of the trial court to instruct.

While results may differ in our past decisions, the test employed by this court has always depended upon the evidence in the particular case under consideration. In *State v. Mason*, 208 Kan. 39, 42, 490 P.2d 418 (1971), we said the duty of a trial court to instruct on included offenses "arises only where the omitted instructions are 'clearly required by the evidence' and 'the jury might naturally and probably have convicted of a lesser degree or offense' if they had been given. *State v. Winters*, 81 Kan. 414, 421, 105 Pac. 516

[1909]." See *State v. James*, 216 Kan. 235, 238-39, 531 P.2d 70 (1975); *State v. Warbritton*, 211 Kan. 506, 508, 506 P.2d 1152 (1973); *State v. Masqua*, 210 Kan. 419, 424, 502 P.2d 728 (1972).

Before examining the evidence in this case it is helpful to consider the authorities submitted by the defendant and the State. Such an examination demonstrates an instruction on a lesser degree of the crime is not required in all cases where the defendant's testimony raises the issue but that the question is dependent upon the evidence as a whole and whether the defendant might have been reasonably convicted of the lesser offense based upon that evidence.

## The Defendant's Authority

*State v. Clark* involved a charge of second-degree murder against a husband who, at home one evening, shot his wife three times. Evidence was introduced through others, including a psychologist familiar with the parties, that their relationship was volatile to the extreme, particularly on the subject of his children by a prior marriage. Several times they had pointed guns at one another in anger. On the night of the shooting, the defendant and his wife had another argument about his children. She stated she was leaving. The defendant testified that he panicked when he saw his wife pointing a gun at him, dove for his gun in the bedroom, and heard a loud explosion. He testified he blacked out and remembers nothing. When he realized that his wife had been wounded, he called the police and an ambulance.

One of the points raised on appeal in *Clark* was the failure of the trial court to instruct on involuntary manslaughter, an unintentional murder. Under the evidence, this court reversed the defendant's conviction of voluntary manslaughter based upon the failure of the court to instruct on involuntary manslaughter. We said:

"Although we concede the evidence of an unintentional killing is weak and inconclusive, we believe defendant's testimony alone was sufficient to raise a legitimate issue for proper consideration by the jury. As previously noted, defendant testified he was startled when he turned around and saw his wife pointing a gun at him and he 'panicked.' Some significance can be attached to the fact these parties had pointed guns at each other on several other occasions without fatal consequences. Although defendant admits shooting his wife, he claims no knowl-

edge of pointing the gun at her or of pulling the trigger. The only direct testimony as to what occurred prior to the shooting is necessarily limited to defendant's account. If defendant is believed, the jury could find that he blacked out temporarily and was not fully aware of what he was doing. We believe the jury might possibly have inferred from defendant's account of the incident that he did not intend to kill his wife." 218 Kan. at 22.

While the evidence in *Clark* required an instruction on the lesser included offense, *Clark* does not stand for the general proposition that in every case where a defendant testifies concerning issues of the lesser included offenses a trial court must instruct. *Clark* did not so conclude but only indicates that in the circumstances of that case the defendant's testimony was sufficient to raise a legitimate issue for proper consideration by the jury. One such circumstance was evidence that the pointing of guns had occurred in anger between the parties on prior occasions corroborating in some respects the defendant's statement that his wife, on this occasion, had pointed a gun at him. Another circumstance was the plausibility of the defendant's testimony which raised an issue for jury resolution. Finally, the court noted that there were no witnesses other than the defendant. 218 Kan. at 22. The principle adopted in *Clark* is clearly stated:

"We have emphasized that evidence of a lesser offense need not be strong or extensive, as long as the evidence presents circumstances from which such lesser offense might reasonably be inferred; and the unsupported testimony of the defendant alone, if tending to establish such inferior degree, is sufficient to require the court to so instruct. [Citations omitted.]" 218 Kan. at 21.

In *State v. Childers*, the defendant shot and killed the victim while the victim was running from the defendant's home. The shooting occurred late at night after the victim came near the window where the defendant was sleeping. A witness testified that he had been with the victim shortly before the victim went to the defendant's home to tell the defendant not to swear at his child and a visiting friend of his child. The victim approached the window, said something, and started walking away when the defendant said something. He went back and asked what the defendant had said and the defendant started shooting.

The defendant testified he had been awakened earlier in the evening by the children playing with his dogs, causing them to bark. He gave them candy to stay away and returned to bed. The victim approached his window, started an argument about the children and left. Just as the defendant was getting to sleep again, the victim returned and started another argument about the children.

The defendant testified that it was dark and he could not see but grabbed his gun from his bureau drawer, sat up, and shot once through the screen window "not shooting at him [the victim] because I couldn't see [too] well, it was dark, [but] to scare him out of my yard, make him get away, leave me alone." 217 Kan. at 413. The angle of fire corroborated the defendant's testimony. The court also noted that the defendant's two statements to the police given on the night in question were "fundamentally consistent with his testimony at the trial." 217 Kan. at 412.

The jury was instructed on second-degree murder and voluntary manslaughter but not on involuntary manslaughter. We reversed the defendant's conviction of second-degree murder because of the trial court's failure to instruct on involuntary manslaughter. We concluded that the "record discloses sufficient evidence supporting the appellant's theory that the killing was done unintentionally to require a jury instruction on involuntary manslaughter." 217 Kan. at 416. Citing *State v. Clark*, 214 Kan. 293, 521 P.2d 298 (1974), we noted:

> "There it was said the accused has a right to have his theory of the case presented to the jury under appropriate instructions, where there is support in the evidence therefore, even though the evidence may be weak and not conclusive; that the testimony of the defendant alone, *if tending to show a lesser degree of crime*, is sufficient to require the court to so instruct. (See also, *State v. Boyd*, 216 Kan. 373, 532 P.2d 1064.)" *Childers*, 217 Kan. at 415. (Emphasis added.)

*State v. Seelke* involved a wife who was convicted of voluntary manslaughter in the shotgun slaying of her drunken husband who had just savagely beaten her and threatened both her and her twin babies. Evidence was introduced involving the victim's savage treatment of his wife after his frequent drinking binges. She testified that when she fired the shotgun she did not know where any of the shots went and wanted merely to prevent her husband from

coming after her and killing her or her babies. Other than the defendant and the victim, there were no witnesses to the shooting which occurred in the parties' home.

This court reversed the defendant's conviction of voluntary manslaughter and remanded for trial based in part on the failure of the trial court to instruct on involuntary manslaughter. 221 Kan. at 681. The court noted that the defendant's husband weighed 200 lbs and was 6'2" tall. The defendant weighed 104 lbs. She was alone in the house with twin babies and her husband had been released from the psychiatric ward of St. Francis Hospital in Wichita the previous afternoon. It was undisputed that the victim was a mean drunk and brutally beat the defendant before the shooting occurred, a circumstance corroborated by medical evidence. The defendant had no car and no telephone, and the nearest neighbor was one-half mile away. She testified she did not want to kill, hurt, or shoot him, but also she did not want to die or have her babies die.

After an extensive discussion involving a trial court's duty to instruct on a lesser offense, this court concluded that the evidence required the trial court to give an instruction on involuntary manslaughter. In doing so this court stated the basic rule that, "[i]n order for such an instruction to be required some evidence must be presented tending to show that defendant should be convicted of the lesser included offense. If no evidence of the lesser offense is presented, an instruction on the lesser offense should not be given." 221 Kan. at 675-76.

In *State v. Gregory*, the defendant was charged with second-degree murder and convicted of involuntary manslaughter. Gregory was called outside by the victim after an argument occurred between the victim and another in a bar. Gregory testified that the victim came at him with an open knife and threatened to kill him. He was alone with the victim outside the bar and testified that he was deathly afraid of knives. He saw "that blade shining," retreated to the tavern door, found he couldn't open it, pulled his pistol, and shot once, "trying to stop him." The victim's knife was some 4 inches long and was found on the ground 10 to 15 feet from the steps where Gregory had been standing. It was closed. Gregory

was the first to suggest calling the police and an ambulance, further negating an intent to kill.

On appeal, Gregory argued, among other claims, that his objection to an instruction on involuntary manslaughter should have been sustained by the trial court because the evidence did not support such an instruction. This court concluded that the giving of an instruction on involuntary manslaughter was required under the evidence, but that the involuntary instruction given was improper requiring reversal. This court again noted that there was ample evidence to require submission to the jury on involuntary manslaughter: "[T]he jury might well have believed he [the defendant] did not intend to kill him but only, in his words, 'to stop him.' " 218 Kan. at 184. We stated: "We have many times held that an instruction on an included offense is not proper if from the evidence the jury could not reasonably convict of the lesser offense." 218 Kan. at 183.

Recently, the Kansas Court of Appeals reversed a defendant's conviction in part on the basis that the trial court failed to give an instruction on involuntary manslaughter. In *State v. Mitchell*, the defendant claimed that the victim had pulled a gun on him and he was afraid for his life, so he pulled out his own gun, closed his eyes, and began shooting. Based upon the evidence, the Court of Appeals concluded that a jury could have concluded that the victim was the initial aggressor and the defendant acted in self-defense but with excessive force requiring an involuntary manslaughter instruction. See 23 Kan. App. 2d at 416-17. The Court of Appeals recounted the basic principles followed in Kansas:

"If there is substantial evidence upon which the defendant might reasonably have been convicted of a lesser offense, an instruction on the lesser included offense is required. *State v. Shannon*, 258 Kan. 425, 427, 905 P.2d 649 (1995). Evidence supporting the instruction of a lesser included offense may be presented either by the defendant or by the State. *State v. Coleman*, 253 Kan. 335, 354, 856 P.2d 121 (1993). Even the unsupported testimony of the defendant alone, if tending to establish such lesser offense, is sufficient to require the district court to so instruct. *State v. Harmon*, 254 Kan. 87, Syl. ¶ 1, 865 P.2d 1011 (1993). The failure to give a lesser included offense instruction on involuntary manslaughter when the evidence supports the request is reversible error. See *State v. Warren*, 5 Kan.

App. 2d 754, 758, 624 P.2d 476, *rev. denied* 229 Kan. 671 (1981)." 23 Kan. App. 2d at 416.

State's Authority

In *State v. Staab*, 230 Kan. 329, 635 P.2d 257 (1981), the defendant shot his ex-lover's new husband on the husband's porch after barging into the house. He then drove home and called his ex-lover, telling her that he had done what he said he would do. He contended at trial that he had committed a lawful act of self-defense in an unlawful manner and did not intend to kill the victim. However, this court reviewed all the facts, including the defendant's jealousy and dislike of the victim, the defendant's going to his house and arming himself before calling on the victim late at night, the defendant's walking into the victim's house uninvited, the defendant's shooting the unarmed victim twice, with one shot in the back, and the defendant's gloating afterward on the phone, and concluded that the defendant's bare testimony did not rise to the level of substantial evidence that the killing was unintentional. 230 Kan. at 340.

This court noted that the victim was dressed in cut-off blue jeans with no shirt, obviously unarmed. The defendant initially claimed the victim had reached for something under his shirt or vest. At trial, his testimony changed, saying the victim reached across his body for something and he shot him in self-defense. In reaching the conclusion that the trial court did not err in failing to give an instruction of the lesser included offense of involuntary manslaughter, this court restated the general rule that "the duty to instruct on lesser included crimes arises only when there is evidence under which the defendant might have reasonably been convicted of the lesser offense. [Citations omitted.]" 230 Kan. at 339.

We stated that the duty to instruct on lesser crimes is designed to give the defendant the right to have the court instruct the jury in the law applicable to his contention. We noted that to refuse so to instruct the jury would be to invade its province in the trial of a case. 230 Kan. at 339. Although we again noted that the instruction should be given even if the evidence is weak and inconclusive, or

consists solely of the defendant's testimony, we made it clear that ultimately the duty depends upon the evidence.

In *Staab*, after examining the evidence to determine whether such a duty existed, this court concluded: "The defendant's bare statement, unsupported by other evidence, is the only possible evidence of unintentional killing or self-defense." We stated:

"When the defendant's statement is considered against the volume of uncontroverted, competent evidence of defendant's jealousy and dislike of the victim; his going to his house and obtaining a loaded pistol before calling on the victim late at night; his walking into the victim's house uninvited; his shooting the obviously unarmed victim twice, with one of the shots entering the victim's back; along with defendant's gloating phone call to 'tell Marge I did what I said I'd do,' it renders his bare statement insubstantial. We hold the defendant's theory of unintentional killing and self-defense is not supported by substantial evidence." 230 Kan. at 340.

The decision in *Staab* was cited by this court in *State v. [Cain] Dixon*, 248 Kan. 776, 811 P.2d 1153 (1991). In *Dixon*, the defendant, upset because his estranged wife was seeing another man, obtained a shotgun, forced his way into his wife's apartment, and shot her three times in the legs, resulting in her later death in the hospital from hemorrhagic shock. He claimed at trial that he was upset and had simply "lost his wits" and shot his wife in the legs with no intent to cause her harm or death, and, therefore, should have been entitled to an involuntary manslaughter instruction. 248 Kan. at 785-86. We found his testimony insubstantial when compared to the evidence that he had made threats to kill his estranged wife, obtained a shotgun on the day of the killing, forced his way into the apartment, and shot an unarmed victim three times as she pled for her life. Not unlike the decision in *Staab*, we concluded that "[i]n light of the overwhelming evidence presented at trial, we find Dixon's sole statement denying intent to kill or harm Bonnie insufficient to support a finding of involuntary manslaughter. Thus, the trial court did not err in refusing to give the requested jury instruction." 248 Kan. at 787.

In *State v. [Elbert] Dixon*, 252 Kan. 39, 843 P.2d 182 (1992), we reversed on the basis that the trial court failed to give an instruction on attempted second-degree murder where the defend-

ant was charged and convicted of attempted first-degree murder. We noted that "[i]n the present case, even though Dixon was the source of most, if not all, the evidence tending to show the absence of deliberation or premeditation, that evidence does not consist solely of a self-serving declaration that his action lacked those qualities." In his taped statement Dixon said, "I was scared at first—I didn't want to do it." He also said that he pointed the gun at her and fired. Thus, there is evidence that he fired on impulse rather than following deliberation." 252 Kan. at 44-45. We noted that "the issue is not whether the evidence is strong but whether Dixon might reasonably have been convicted of the lesser offense of attempted second-degree murder, the attempt intentionally to kill Bell without premeditation or deliberation." 252 Kan. at 45. We also discussed the applicable standard of review stating: "Because reasonableness is an element of this test, there is some weighing of the evidence which occurs. A finding of sufficient evidence tending to show the lesser degree of the crime triggers the duty. [Citation omitted.] The weighing of evidence, however, is not a retrial of the case." 252 Kan. at 43.

More recently, in *State v. Hickles*, 261 Kan. 74, 929 P.2d 141 (1996), this court found that a defendant's testimony that a stabbing of a police officer "just happened" as they fought for possession of a knife was insufficient to support the giving of an involuntary manslaughter instruction. We found that the evidence was insubstantial when considered along with the fact that the defendant was angry at the victim and had threatened to kill him, stabbed the victim 11 to 13 times, and was seen thrusting his knife into the victim and then kicking the victim in the chest and head. 261 Kan. at 84. We said:

"The question is not whether, in the mind of the court, the evidence as a whole excludes the idea that the defendant is guilty of a lesser degree of the offense charged, but whether there is any substantial evidence tending to prove a lesser degree of the offense. If there is, then the question of such degree should be submitted to the jury." 261 Kan. at 83.

The above authorities submitted by the defendant and the State express the same rule. The duty of a trial court to instruct on a lesser included offense arises only where there is evidence upon

which the accused might reasonably be convicted of the lesser offense. Because the test is based upon reasonableness, some weighing of the evidence occurs but it is not a retrial of the case. *State v. [Elbert] Dixon*, 252 Kan. at 43. The appellate court, based upon a review of all the evidence read in a light favorable to the defendant, must determine whether from the evidence the jury could reasonably convict of the lesser offense. The evidence may be weak and inconclusive and may be based upon the testimony of the defendant alone, *if tending to show a lesser degree of crime.*

It is not the function of an appellate court to determine whether the factual possibilities mentioned at trial should prevail. Rather its function is to exercise judicial judgment as to whether there was sufficient evidence in the record to necessitate an instruction of the lesser offense. Such a determination is made from the evidence as a whole and while in a given case the defendant's testimony alone may be sufficient to require such an instruction, it may also fall short of raising the duty to instruct. The test is a factual one based upon the evidence as a whole.

## Examination of the Evidence on Involuntary Manslaughter

The defendant contends that there was sufficient evidence in the record to necessitate an instruction of the lesser offense of an unintentional but reckless killing. He also argues there was sufficient evidence to necessitate an instruction on the theory that he engaged in the lawful act of self-defense but with excessive force. See K.S.A. 1998 Supp. 21-3404(c); *State v. Myers*, 245 Kan. 471, 474, 781 P.2d 700 (1989). He relies upon his trial testimony and claims that like the defendant in *Gregory*, 218 Kan. 180, he fired at the victim to stop him from using what he believed to be a weapon and did not remember the remaining shots.

Unlike *Gregory* in which only one shot was fired to stop the victim, here there was substantial evidence concerning defendant's killing of the victim. His assertion that he fired the first shot in self-defense and then blacked out and did not remember the other four shots must be considered along with the other evidence.

Other than the defendant's statement, there is absolutely no evidence from which a jury might conclude that the killing was un-

intentional and that he engaged in self-defense with excessive force. The excessive force rationale is premised on the basis that a person is justified in the use of force against an aggressor when and to the extent it appears to the person and he or she reasonably believes that such conduct is necessary to defend himself or herself or another against such aggressor's imminent use of unlawful force. See *Myers*, 245 Kan. at 474. The defendant testified that he saw the victim come up with a shiny object in his hand which the defendant assumed to be a gun. We again point out that defendant did not mention this critical fact to the police in his statement given a short time after the shooting. There is no evidence whatsoever that the victim threatened the defendant with any harm outside of a movement which the defendant interpreted as an attempt to use a firearm. The defendant testified that the victim was not physically aggressive.

The defendant testified that Stella looked him in the eyes and stated that the victim had a gun. This important fact was omitted from his pretrial statement where the defendant stated that he recalled Stella saying something but forgot what it was. The defendant testified that he saw the victim leaning forward in his truck with something shiny in his hand. Again, this fact is absent from his earlier statement to the police. The evidence from a disabled police officer who witnessed the shooting is that the victim had his hands on the steering wheel of his truck. Unlike the situation in *Childers*, the defendant's earlier statement to police shortly after the shooting does not corroborate his trial testimony.

We do not retry the case but because the necessity to give an instruction is based upon reasonableness, some weighing of the evidence is required. *State v. [Elbert] Dixon*, 252 Kan. at 43. The similarity between this case and *State v. Staab*, 230 Kan. 329, is striking. Both cases involved jealousy and a dislike for the victims who the defendants perceived were interfering with an important relationship. In the instant case, the defendant's son testified that the defendant had to restrain himself from shooting the victim the day before he killed the victim. In both cases, the defendants armed themselves for the encounter with the victim. In both instances, the victim was not the aggressor. The evidence in the in-

stant case establishes that the victim was attempting to leave in his truck when the defendant fired. In both cases there were witnesses whose testimony contradicted the defendants' testimony on their claims of self defense. In both cases, the victims were unarmed and shot multiple times at close range. Finally, in both cases, the defendants contacted their girlfriends sometime later and told them, in somewhat of a gloating manner, that they did it for them.

Like *Staab*, the defendant claims that involuntary manslaughter instructions should have been given on his theory of unintentional killing and on the theory that the shooting was a lawful act done in an unlawful manner. The conclusion we reached in *Staab* applies with equal force in this case.

"Here, however, there was no substantial evidence of either element of involuntary manslaughter. The defendant's bare statement, unsupported by other evidence, is the only possible evidence of unintentional killing or self-defense. When the defendant's statement is considered against the volume of uncontroverted, competent evidence of defendant's jealousy and dislike of the victim; his going to his house and obtaining a loaded pistol before calling on the victim late at night; his walking into the victim's house uninvited; his shooting the obviously unarmed victim twice, with one of the shots entering the victim's back; along with defendant's gloating phone call to 'tell Marge I did what I said I'd do,' it renders his bare statement insubstantial. We hold the defendant's theory of unintentional killing and self-defense is not supported by substantial evidence." 230 Kan. at 340.

In the instant case when the defendant's bare statement, unsupported by other evidence, and not corroborated by the defendant's prior statement to police, is considered against the volume of evidence regarding his jealousy and dislike of the victim, his previous threatening activity and statements toward the victim, the nature of the shooting, and his letter to Stella afterwards, it is clear that no jury could reasonably have convicted the defendant of reckless involuntary manslaughter. Further, there is absolutely no evidence which would allow a reasonable jury to find the defendant guilty of involuntary manslaughter on the theory that the defendant engaged in the lawful act of self-defense with excessive force. The only testimony of the defendant regarding self defense was that he thought the victim had a gun. If the jury believed this testimony, then the defendant's use of force in shooting the victim would not have been excessive. Because the evidence would not have allowed

the defendant to be reasonably convicted of involuntary manslaughter under either theory, the trial court did not err in failing to give an instruction on involuntary manslaughter.

Instruction On Sudden Quarrel Or Heat Of Passion

The defendant also argues that the trial court erred in failing to give an instruction on the lesser included offense of voluntary manslaughter based on sudden quarrel or heat of passion. He argues that the evidence supports the giving of such an instruction. The defendant included such an instruction in his proposed instructions at trial.

The defendant's contention is without merit. While there is some evidence in this case that the defendant was under stress as the result of his breakup with Stella, we have held that an intentional killing committed in the heat of passion must result from severe provocation. See *State v. Follin*, 263 Kan. 28, 33, 947 P.2d 8 (1997). The test for whether severe provocation exists is objective, and the provocation must be sufficient to cause an ordinary person to lose control of his or her actions or reason. 263 Kan. at 34.

There is no evidence of provocation which rises to the level required in *Follin*. The defendant's own testimony indicated that the victim was not physically aggressive. While the defendant correctly notes that a witness who viewed the incident from inside the Taylor Mart testified that the defendant and the victim struggled, he fails to acknowledge that the witness stated that the defendant instigated the struggle by reaching into the truck where the victim was sitting. There is no evidence that the victim in this case provoked the defendant. Although there is some evidence that Stella pushed or struck the defendant, there is no evidence from which a reasonable person could conclude that it was sufficient to cause an ordinary person to lose control. The jury could not reasonably have convicted the defendant of voluntary manslaughter under a sudden quarrel or heat of passion theory. There was no duty to instruct on this theory. See *State v. Robinson*, 261 Kan. 865, Syl. ¶ 7, 934 P.2d 38 (1997).

Supplemental Instructions Given During Deliberation

The defendant's final contention is that the trial court erred in giving the jury an additional instruction outside the presence of the

defendant without securing a waiver from the defendant. The jury's question in this case centered on Instruction 3 regarding voluntary manslaughter. That instruction stated:

"The defendant is charged with the crime of murder in the second degree. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant intentionally killed Paul G. Madden; and

"2. That it was not done upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person; and

"3. That this act occurred on or about the 27th [day of] February, 1997, in Sedgwick County, Kansas."

During its deliberations, the jury sent the following note to the judge during deliberations: "We need more information in regards to instruction 3, statement 2." The trial court, after consulting with both attorneys and after the defendant's attorney had objected to the giving of any supplemental instruction to the jury, prepared the following written response that was delivered to the jury:

"Paragraph 2 of Instruction No. 3 is the opposite of Paragraph 2 of Instruction No. 5. If you find that the defendant intentionally killed Paul G. Madden with an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person, this constitutes voluntary manslaughter. If you find that the defendant intentionally killed Paul G. Madden and it was not done with an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person, this constitutes murder in the second degree.

"Please consider this answer together with all of the other instructions the court has given you. If you have any further questions, please advise the bailiff."

The correct procedure for a trial court to follow when answering a question from a deliberating jury is set forth in K.S.A. 22-3420(3). *State v. Dunnan*, 223 Kan. 428, 432, 573 P.2d 1068 (1978). K.S.A. 22-3420(3) requires that once the jury has begun deliberations, any questions from the jury concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence, unless the defendant is absent voluntarily. *Crease v. State*, 252 Kan. 326, 333, 845 P.2d 27 (1992).

K.S.A. 1998 Supp. 22-3405, as well as the Sixth Amendment's Confrontation Clause and the Due Process Clause of the Fourteenth Amendment, require the defendant's presence at every critical stage of a trial. See *Crease v. State*, 252 Kan. at 333. See also

*State v. Lovely*, 237 Kan. 838, 844, 703 P.2d 828 (1985). This includes all times when the jury is present in the courtroom and whenever the trial court communicates with the jury. *State v. Perkins*, 248 Kan. 760, 769, 811 P.2d 1142 (1991).

Because the record does not disclose that the defendant was present during this time period or that he waived his right to be present, we conclude that the defendant's constitutional right to be present was violated and that K.S.A. 22-3420(3) was not followed. However, this error is subject to the harmless error rule. In determining whether the denial of a defendant's right to be present at all critical stages of the trial is reversible error, this court has applied the same harmless error test as for other constitutional errors. See *State v. High*, 260 Kan. 480, 485-86, 922 P.2d 430 (1996); *State v. Bowser*, 252 Kan. 582, 587-88, 847 P.2d 1231 (1993); *Crease v. State*, 252 Kan. at 334. Under this test:

" 'An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. [Citations omitted.] Thus, before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. [Citation omitted.]' [Citation omitted.]" *Crease v. State*, 252 Kan. at 334.

The trial court's written response in this case accurately stated the law. It placed no undue emphasis on either outcome. Although the defendant contends that his presence was vital to verify that all the jurors shared the information and understood the court's response, we have no hesitancy in concluding that the error had little, if any, likelihood of having changed the result of the trial.

Affirmed.