IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,739

STATE OF KANSAS,
*Appellee*,

v.

CLYDE JAMES BARNES JR.,
*Appellant*.

SYLLABUS BY THE COURT

1.

A court's subject matter jurisdiction, which is its very power to hear and decide a case, flows from article 3 of the Kansas Constitution and from laws generally expressed through statute.

2.

Article 3 of the Kansas Constitution gives the Legislature the power to define a Kansas district court's subject matter jurisdiction. Consistent with that power, K.S.A. 2020 Supp. 21-5106(b)(3) grants Kansas district courts subject matter jurisdiction over crimes when the proximate result of the criminal act occurs within Kansas. In other words, Kansas district courts have subject matter jurisdiction over crimes where there is a direct connection or nexus between the defendant's act or acts outside Kansas and the result in Kansas.

3.

Venue describes the proper place for a lawsuit to proceed. It is a procedural matter, rather than a jurisdictional one, and it can be waived.

1

4.

A court's subject matter jurisdiction does not depend upon venue considerations.

5.

Vicinage refers to the place from which the jurors are drawn.

6.

Section 10 of the Kansas Constitution Bill of Rights' right to "an impartial jury of the county or district in which the offense is alleged to have been committed" is a vicinage provision that operates as an indirect venue limitation. The right is a personal privilege and is waived if not asserted at the district court.

7.

A contemporaneous objection is not required to preserve claims of prosecutorial error for appellate review.

8.

PIK Crim. 4th 54.150, without modification, is not misleading and accurately states the law of premeditation.

9.

In assessing invited error, the ultimate question is whether the record reflects the party's action in fact induced the court to make the claimed error. But when the record shows that a district court made its decision independent of counsel's comments, invited error does not apply.

Appeal from Johnson District Court; TIMOTHY P. MCCARTHY, judge. Oral argument held September 11, 2024. Opinion filed February 21, 2025. Affirmed.

*Samuel D. Schirer*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant, and *Clyde James Barnes Jr.*, appellant, was on a supplemental brief pro se.

*Jacob M. Gontesky*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

WILSON, J.:  A jury convicted Clyde James Barnes Jr. of first-degree premeditated murder, aggravated burglary, tampering with electronic monitoring equipment, criminal threat, and violation of a protective order. On direct appeal, he asserts many errors. We affirm his convictions and sentence.

## FACTS AND PROCEDURAL BACKGROUND

Clyde Barnes Jr. and Jessica Leigh Smith ended a long romantic relationship in November 2019. They had two children together, who were seven and eight years old in July 2020. Smith also had a daughter from a previous relationship, D.S., whom Barnes helped raise from a young age.

After the breakup, "as part of a Johnson County criminal case," Barnes was ordered to have no contact, direct or indirect, with Smith, and also to be on house arrest. By May 2020, Barnes was living in the basement of his father's residence in Kansas City, Missouri. While there, Barnes recorded a video in which a mattock can be seen briefly.

On July 2, Barnes' car—a white Cadillac with a large black racing stripe across the car's hood and roof—ran out of gas heading southbound on K-7. Barnes had been given permission under his bond for house arrest to travel to and from Topeka that day. At the

3

time, Barnes' car did not have any damage to its front end and was not missing a hubcap. According to the officer who stopped to assist Barnes that day, Barnes was at first frustrated about his car troubles, but then he began to talk about Smith. Barnes became "very upset, frustrated, angered," called Smith a "crazy bitch," and blamed Smith for being unable to see his children.

Sometime on or shortly before July 4, 2020, Barnes' son used Serron Nunn's phone to call Barnes about getting some fireworks. For some reason, this made Barnes angry. Barnes then texted Serron—Barnes' biological nephew—to see whether Serron would bring Barnes' children for a visit on July 4. Although Serron said he would drive the children over, Smith vetoed it.

In the evening of July 4, Smith and Serron went to a casino, where they spent several hours and bought fireworks. Shortly after midnight on July 5, Barnes posted a video to Facebook. In the 24-second video, Barnes says:

> "I just want to say man before I leave this motherfucker I guarantee you motherfuckers
> playing games with me right now, you [n-words] is gonna feel my motherfuckin pain,
> pain that I'm feeling right now, without having my kids around, [n-words] is gonna feel
> the pain that I'm feeling . . . and it ain't gonna last long."

Barnes called Serron four times between 12:30 a.m. and 12:52 a.m., but Serron did not answer. Barnes also called Michelle Nunn, his older sister, angrily asking "where Serron was because he isn't picking up the phone" and saying "[t]hey can call me about fireworks, but they won't pick up the phone. They playing games, but I am not."

Michelle, who is Serron's mother, began texting Serron around 2:30 a.m., telling him that Barnes was "basically tripping off his kids" and that he "needed to stay out of the way." According to Michelle, Barnes was angry that his son had called him for

4

fireworks and was out for vengeance, and that Serron "need[ed] to stay out of that." Michelle was also concerned because Serron "was the main one that hung out with" Smith and Barnes' two children.

Barnes was required to wear a GPS bracelet as a condition of his house arrest. At 1:15 a.m. on July 5, the "tracker strap" and "proximity tamper" alerts went off on Barnes' bracelet. At 1:17 a.m., the bracelet was reset, but "the proximity tamper did not restore," meaning that there was no ankle in the bracelet. Barnes also placed the external battery on the bracelet at 1:17 a.m.; at 2:19 a.m., the bracelet beeped loudly for two full minutes to tell Barnes that it was fully charged, but nobody turned off the alarm. House arrest personnel did not respond to the alerts at that time. A later inspection confirmed that Barnes' bracelet was working fine, but a hole in the clip and a chipped corner indicated that it had been tampered with.

As Serron and Smith drove back to Smith's residence from the casino, they saw a white Cadillac near the house. Serron could not see the driver, but he did not think it was Barnes' car at first because Barnes was supposed to be on house arrest and because the car now had a racing stripe on top, rather than on the side. A surveillance video from the house across the street from Smith's residence showed Barnes' Cadillac drive by a little before 2:30 a.m. Michelle, who lived nearby and happened to be on her front porch to smoke a cigarette, also reported seeing Barnes' Cadillac driving by around this time, though she could not see the driver because he was wearing all black clothing.

Surveillance cameras from an elementary school one street to the west of Smith's residence recorded Barnes' Cadillac repeatedly circling the area around her residence between about 2:04 a.m. and 2:44 a.m. During this time, Barnes' Cadillac apparently collided with a parked Nissan on Smith's street, which damaged the Cadillac's front quarter panel and left one of the Cadillac's hubcaps in a neighbor's yard.

5

At 2:44 a.m., the Cadillac drove to a dumpster enclosure at the school, where its taillights turned off. A figure then walked down the street at 2:48 a.m., heading toward Smith's residence.

During this same time, Serron and Smith shot off fireworks briefly after they returned home; a neighbor's surveillance camera documented that they went inside at about 2:45 a.m. and 2:47 a.m. Once inside, Serron fell asleep on the couch while Smith was talking to him.

Serron then woke up "with someone in the kitchen and my auntie basically walking towards that person." The intruder was dressed all in black ("a zipped-up hoodie or a pullover and sweatpants") and wore a black mask and hood; all Serron could see was their eyes, which were brown. Serron thought the eyes looked like Barnes', and that the intruder shared Barnes' posture, size, and height.

Smith started walking towards the intruder "like she knew the person." Serron heard her say, "No," and "Jay" or "June," but by that point he was running because the intruder was holding something that "looked like an ax." (The family sometimes called Barnes "Junior" or "Uncle Junior.")

Serron dropped his cell phone at the front door, stopped to pick it up, and ran out the door. When he stopped to grab his phone, Serron looked back and saw Smith on the floor, screaming for help with the intruder standing over her.

At about 2:57 a.m., the neighbor's camera registered a loud popping noise, and then showed Serron running out the front door.

6

D.S., who was sleeping in the basement at the time of the break in, woke up a little before 3 a.m. to the sound of a loud boom and her mom, Smith, screaming. She locked the door and called 911. When she went upstairs "to get the cops," she saw her mom lying on the floor. Police arrived minutes later, at 3:04 a.m.

Responding officers found a grisly scene. Smith's body lay on the kitchen floor, which was covered in blood. Bloody footprints—beginning near Smith's body—led out the back door, down the back steps, and onto the patio beyond. The back doorjamb was damaged, with the striking plate on the floor; one investigator testified that this damage would be consistent with the door being kicked in.

Smith was dead. She "basically [had] half a head left," and something that appeared to be brain matter was lying on the floor beside her. "There was severe trauma to [Smith's] head to the point that . . . her face was unrecognizable to a point." Some unidentified weapon had carved at least three gouge marks into the linoleum floor around Smith's body, near where her head and neck had been. A bloodstain pattern analysis suggested that Smith was struck in the head multiple times, at least once while she was on the floor, and before being moved. An autopsy revealed cuts to Smith's torso, fractures to her left ribs, injuries to the left kidney, large cuts to her neck—one on the left, one on the right—and massive injuries to Smith's head, caused by at least two blows—one to the back of her head, and one to her face. At least three of these wounds would have been independently fatal.

A police K9 picked up a scent from the back yard of the residence immediately to the west of Smith's. The dog followed it through an open gate and onto the street, where the dog lost the scent. A few days later, officers recovered a red-stained mattock beneath the parked camper in a neighbor's driveway, after one of the residents found it and alerted

the police. This same neighbor always kept his gate closed, but it was open when the police found it.

Investigators found a black latex glove near where the Cadillac was parked on the night of July 5; they also found another glove near the curb, on the edge of the concrete gutter and blacktop. The gloves had been turned inside out. Testing revealed a high likelihood that the DNA inside the gloves belonged to Barnes, while the DNA from the red stains on the outside of the gloves (along with the mattock) belonged to Smith.

Barnes' Cadillac was later found on the shoulder of eastbound I-435, just east of Roe in Overland Park. Barnes admitted to investigators that he was the last one to drive his Cadillac, and that it overheated and broke down on I-435. In contrast to its appearance on July 2, the front passenger hubcap was missing, and the front passenger quarter panel had been significantly damaged. The car also had a flat tire. Inside, investigators found a black fleece mask, a black baseball cap, and black nitrile gloves. Different stains on the mask likely contained DNA from Smith and Barnes. Additionally, samples taken from a luminol-positive (and thus presumptively blood) stain from the subwoofer inside the Cadillac showed a high likelihood of Smith's DNA. The left front seat cushion and some of the carpeting on the floor were also luminol positive.

Traffic cameras captured a person walking at I-435 and Roe at about 3:18 a.m. Barnes Sr. told police that this figure looked like Barnes to him. Then, at 4:08 a.m., a south-facing traffic camera at 102nd and Wornall—about 2 miles away from the camera at I-435 and Roe—recorded a similar person walking north, over the bridge spanning Indian Creek. Barnes' brother later identified the figure walking in the videos as Barnes based on his "very distinctive" way of walking and because, in the video from the Indian Creek bridge, "I know what my brother looks like from that angle." At 4:09 a.m., the person stopped at the midway point of the bridge and began to remove articles of clothing

8

and shoes, and then threw them over the side of the bridge and into Indian Creek. After discarding the clothing, the figure continued heading north, shirtless and apparently barefoot.

A subsequent search of the creek below the bridge turned up a pair of shoes, two black socks, and a couple pairs of black shorts. Comparison revealed several associations between these shoes and footprints at the crime scene.

Barnes woke his father at about 5 a.m. to tell him "that people would be calling about his ankle monitor." Barnes had no shirt on. At 5:01 a.m., the ankle bracelet's charger battery was removed; at 5:02 a.m. the bracelet was reset—meaning that, from 1:15 to 5:02 a.m., no ankle was in the bracelet.

At about 11:30 a.m. that morning, Serron's phone received a text message from Barnes: "U NXT." Serron interpreted this to mean, "You're next." Barnes was later arrested, after his friend delivered Barnes to house arrest personnel to answer their questions.

The State charged Barnes with first-degree premeditated murder, aggravated burglary, tampering with electronic monitoring equipment, criminal threat (later clarified to allege Serron as the victim), and violation of a protective order.

The case went to jury trial, which lasted six days. The jury found Barnes guilty on all counts. The district court sentenced Barnes to lifetime imprisonment with a mandatory minimum of 620 months for first-degree premeditated murder, plus additional consecutive sentences of 172, 19, and 7 months for aggravated burglary, tampering with electronic monitoring equipment, and criminal threat, respectively; it sentenced Barnes to a 12-month concurrent sentence for violating a protective order.

Barnes directly appeals. Jurisdiction is proper. See K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 22-3601); K.S.A. 22-3601(b)(3)-(4) (life sentence and off-grid crime cases permitted to be directly taken to Supreme Court); K.S.A. 21-5402(b) (first-degree murder is off-grid person felony).

Additional facts will be discussed below where relevant to the issues.

DISCUSSION

*Because Section 10 of the Kansas Constitution Bill of Rights does not govern a district court's subject matter jurisdiction, Barnes' claim that K.S.A. 21-5106(b) violates Section 10 is unpreserved.*

Barnes argues the territorial jurisdiction statute under which he was prosecuted for tampering with electronic monitoring equipment violates the Kansas Constitution. We find this argument is unpreserved for review.

*Additional Facts*

On July 5, 2020, the day of Smith's murder, Barnes was on house arrest ordered by the Johnson County District Court. House arrest is the "confinement of a person who has been accused or convicted of a crime to his or her home, usu[ally] ensuring the person's whereabouts by attaching an electronically monitored bracelet to the person." Black's Law Dictionary 883 (12th ed. 2024). Pursuant to this order of house arrest, Barnes wore a GPS ankle bracelet that enabled the house arrest supervisor to monitor Barnes' physical location at all times, and thus enabled that supervisor to determine whether Barnes was in compliance with the house arrest requirements. At all times pertinent, Barnes was living

10

with his father in Kansas City, Missouri. Testimony at trial indicated the bracelet had been reset and was not in contact with an ankle in the early hours of July 5.

During closing argument, the State explained that even though the act of tampering occurred at Barnes' father's residence in Missouri, a Kansas statute, K.S.A. 21-5106, allowed prosecutors to charge Barnes with the crime of tampering with electronic monitoring equipment if Barnes' activities in Missouri caused a proximate result in Kansas. The jury convicted Barnes of the charge.

*Discussion*

On direct appeal, Barnes argues his prosecution under K.S.A. 2020 Supp. 21-5106 violates section 10 of the Kansas Constitution Bill of Rights. This constitutional provision provides:

> "In all prosecutions, the accused shall be allowed to appear and defend in person, or by counsel; to demand the nature and cause of the accusation against him; to meet the witness face to face, and to have compulsory process to compel the attendance of the witnesses in his behalf, and a speedy public trial *by an impartial jury of the county or district in which the offense is alleged to have been committed.* No person shall be a witness against himself, or be twice put in jeopardy for the same offense." (Emphasis added.)

K.S.A. 2020 Supp. 21-5106(a) provides "[a] person is subject to prosecution and punishment under the law of this state if . . . [t]he person commits a crime wholly or partly within this state."

And K.S.A. 2020 Supp. 21-5106(b) provides:

> "(b) A crime is committed partly within this state if:

11

(1) An act which is a constituent and material element of the offense;

(2) an act which is a substantial and integral part of an overall continuing criminal plan; or

(3) the proximate result of such act, occurs within the state."

We have unlimited review over questions of constitutional and statutory interpretation. *State v. Garcia*, 285 Kan. 1, 7, 169 P.3d 1069 (2007).

Barnes acknowledges he did not raise the constitutionality of K.S.A. 21-5106(b) before the district court. Generally, we only review unpreserved constitutional claims if one of our three prudential exceptions applies, but even the existence of one of these exceptions does not require us to reach the issue. E.g., *State v. Gutierrez-Fuentes*, 315 Kan. 341, 347, 508 P.3d 378 (2022) (noting three discretionary exceptions to the general preservation rules). We decline to review this issue under these exceptions.

Still, despite Barnes' failure to preserve the constitutional challenge to K.S.A. 21-5106(b), he asserts we must consider it anyway because the district court's subject matter jurisdiction over the tampering charge hinged on the constitutionality of K.S.A. 21-5106(b). See *State v. Clark*, 313 Kan. 556, 560, 486 P.3d 591 (2021) (quoting *State v. Garcia-Garcia*, 309 Kan. 801, 806, 441 P.3d 52 [2019]) ("A jurisdictional question may be raised at any time and may also be raised sua sponte by the appellate court.").

We disagree that his argument implicates subject matter jurisdiction and take this opportunity to clarify and disentangle the concepts of jurisdiction, venue, and vicinage in Kansas. As one commentator has observed, these concepts have "significant (and confusing) overlap." Kalt, *Crossing Eight Mile: Juries of the Vicinage and County-Line Criminal Buffer Statutes*, 80 Wash. L. Rev. 271, 276 (2005). Our caselaw has been less than clear regarding these terms, though precision is of the utmost importance regarding these fundamental principles of our law. See, e.g., *Nicholson v. Mercer*, 319 Kan. 712,

12

715, 559 P.3d 350 (2024) (observing "imprecise language in our historical precedent" regarding subject matter jurisdiction "may have led to confusion by the parties and lower courts").

*The Johnson County District Court had subject matter jurisdiction.*

"Jurisdiction refers to the adjudicatory power or competency of the court[] and not to the rights of the parties as between themselves." 21 C.J.S. Courts § 12. A district court's legal authority to issue binding orders "requires both subject matter jurisdiction and personal jurisdiction." *Pieren-Abbott v. Kansas Dept. of Revenue*, 279 Kan. 83, 92, 106 P.3d 492 (2005).

"Personal jurisdiction involves a court's power to make an adjudication applicable to a person, contrary to that person's legal interests, and binding the particular person. A court's personal jurisdiction refers to its power to impose judgment on a particular person." 21 C.J.S. Courts § 44. In criminal cases, personal jurisdiction "is based on physical presence, usually obtained through arrest." Perritt, *Jurisdiction in Cyberspace*, 41 Vill. L. Rev. 1, 35 (1996).

"'Subject matter jurisdiction is the power of the court to hear and decide a particular type of action.'" *State v. Dunn*, 304 Kan. 773, 784, 375 P.3d 332 (2016) (quoting *State v. Matzke*, 236 Kan. 833, 835, 696 P.2d 396 [1985]). A Kansas state court's subject matter jurisdiction begins with a general grant of power from the Kansas Constitution, the parameters of which may be set by our Legislature through laws duly enacted. More specifically, subject matter jurisdiction

"derives from Article 3, sections 1, 3, and 6 of the Kansas Constitution. Those provisions grant Kansas courts jurisdiction as provided by law. Statutes serve as the usual mechanism for the law to define jurisdiction. . . . By statute, Kansas district courts 'have

13

general original jurisdiction of all matters, both civil and criminal, unless otherwise provided by law.' [Citations omitted]." *In re A.A.-F.*, 310 Kan. 125, 135, 444 P.3d 938 (2019).

Because a court's subject matter jurisdiction only arises from our Constitution or statute, the court's subject matter jurisdiction cannot be conferred upon a court "by consent, waiver, or estoppel." *Mercer,* 319 Kan. at 714; 21 C.J.S., Courts § 15. Without subject matter jurisdiction, a court has no power to order anyone to do anything. See *Benchmark Property Remodeling v. Grandmothers, Inc.*, 319 Kan. 227, 228, 553 P.3d 974 (2024) ("After all, a court without jurisdiction is no court at all, but an expensive debate club overseen by a powerless spectator in a black choir robe."). Even if unchallenged, every court has the duty to ensure it has subject matter jurisdiction over the type of the matter it addresses or its only recourse is to cease acting, to dismiss the matter. *Grandmothers*, 319 Kan. at 233.

"Territorial jurisdiction" has "sometimes [been] mentioned as a third jurisdictional requirement, in addition to subject matter and personal jurisdiction." 21 Am. Jur. 2d Criminal Law § 425 (citing *State v. Legg*, 9 S.W.3d 111, 114 [Tenn. 1999]). The general territorial jurisdiction rule is that a state may only prosecute a person for committing a crime within the state's borders. But, even at the common law, an exception existed for instances where a crime was committed outside the state's borders, but the result of the crime happened within the state's territorial limits. 1 Subst. Crim. L. § 4.4(a) (3d ed.); 4 Crim. Proc. § 16.4(c) (4th ed.). Over time, this common law rule was expanded and codified in statute. 1 Subst. Crim. L. § 4.4(b) (3d ed.); 4 Crim. Proc. § 16.4(c) (4th ed.). The early Kansas Territorial Statutes reflected these ideas, and the various iterations of our post-statehood statutes similarly expanded Kansas' territorial jurisdiction to include certain instances where actions were committed beyond our borders. See, e.g., General Laws of the Territory of Kansas, 1859, ch. 27, sec. 16; K.S.A. 62-401 (Long), K.S.A. 62-404 (Long); K.S.A. 21-3104 (Torrence). K.S.A. 21-5106, the statute relied on by the

State to prosecute Barnes for tampering with electronic monitoring equipment, is the current version of our territorial jurisdiction statute. *State v. Rozell*, 315 Kan. 295, 296, 508 P.3d 358 (2022); *State v. Hillard*, 315 Kan. 732, 776, 511 P.3d 883 (2022) ("territorial jurisdiction" refers to "which state has jurisdiction over the criminal proceedings").

Here, the Johnson County District Court had subject matter jurisdiction over Barnes' tampering charge. Article 3 of the Kansas Constitution gives the Legislature the power to define a district court's subject matter jurisdiction. Under that authority, the Legislature enacted K.S.A. 2020 Supp. 21-5106(b)(3), which provides that Kansas courts have jurisdiction over crimes committed partly in Kansas. This occurs when there is "a direct connection or nexus between the defendant's act or acts outside Kansas and the result in Kansas." *Rozell*, 315 Kan. at 301. The proximate result of Barnes tampering with his GPS bracelet occurred in Kansas because that tampering directly affected a Kansas court's ability to monitor Barnes' compliance with a Kansas district court's bond conditions. Therefore, since the prosecution was appropriate under K.S.A. 2020 Supp. 21-5106, the court had subject matter jurisdiction to try the tampering charge.

*Barnes' Section 10, venue, and vicinage arguments are unpreserved.*

Barnes' claim that the constitutionality of K.S.A. 21-5106(b) impacts the district court's subject matter jurisdiction hinges on an incorrect understanding of the relationship between venue, vicinage, and subject matter jurisdiction. Today we clarify that section 10 of the Kansas Constitution Bill of Rights only involves the former two; it does not impact subject matter jurisdiction.

"[V]enue is not a jurisdictional matter, but a procedural one." *Shutts v. Phillips Petroleum Co.*, 222 Kan. 527, 546, 567 P.2d 1292 (1977); 21 C.J.S. Courts § 13 ("Venue is a procedural matter and refers not to the power of the court to hear a case but to the

geographic location where a given case should be heard."). It describes the "proper or a possible place for a lawsuit to proceed, usu[ally] because the place has some connection either with the events that gave rise to the lawsuit or with the plaintiff or defendant." Black's Law Dictionary 1876 (12th ed. 2024). Venue and subject matter jurisdiction are distinct, and a court's subject matter jurisdiction is not dependent on venue considerations. See 21 C.J.S. Courts § 13 ("Venue requirements are procedural only and have no relation to the question of jurisdiction. Venue does not control jurisdiction and is not a condition precedent to the court's jurisdiction. Proper venue does not establish jurisdiction, and improper venue does not defeat jurisdiction. On the other hand, venue can only be proper where jurisdiction already exists.").

The proper venue for a prosecution is set by the Legislature through statute. See, e.g., K.S.A. 22-2602; K.S.A. 22-2603; K.S.A. 22-2604. But even under these statutes, the venue may be changed in certain circumstances. See, e.g., K.S.A. 22-2616(1) (venue change mandatory upon defendant's motion with sufficient proof).

Unlike subject matter jurisdiction, a defendant's venue challenge may be waived, either by conduct express or implied, or through the failure to assert it timely, though the State still bears the burden of proving proper venue in a prosecution. See *Freeman v. Bee Mach. Co.*, 319 U.S. 448, 453, 63 S. Ct. 1146, 87 L. Ed. 1509 (1943); *In re Estate of Raney*, 63 Kan. App. 2d 43, 51, 525 P.3d 1 (2023); *State v. Hillard*, 315 Kan. 732, 774, 511 P.3d 883 (2022); *State v. Robinson*, 303 Kan. 11, 283, 363 P.3d 875 (2015).

Vicinage, like venue, is similarly related to location, but speaks to "the place from which the jurors are drawn," rather than "the place where the trial is held." Kalt, *Crossing Eight Mile: Juries of the Vicinage and County-Line Criminal Buffer Statutes*, 80 Wash. L. Rev. at 276. Thus, "while the concept of venue does not inherently point to a particular district, but rather requires simply that a district be designated in a venue provision

16

(constitutional or statutory), the concept of vicinage in itself identifies a particular geographical district and arguably limits the territorial scope of that district." 4 Crim. Proc. § 16.1(b) (4th ed.). The vicinage right allowing a defendant's jury to be drawn from the community where the crime occurred existed in our common law, and was based on the idea that the defendant "may have the benefit of his own good character and standing with his neighbors, if these he has preserved [sic], and also of such knowledge as the jury may possess of the witnesses who give evidence before them." *State v. Bunker*, 38 Kan. 737, 741, 17 P. 651 (1888).

Section 10's right to "an impartial jury of the county or district in which the offense is alleged to have been committed" is a *vicinage* provision, not a *jurisdiction* provision. *Bunker*, 38 Kan. at 741. In *State v. Potter*, 16 Kan. 80, 97, 1876 WL 1000 (1876), we explained the "right is merely a personal privilege, bestowed upon the accused, which he can waive or insist upon at his option." See also *State v. Hayes*, 169 Kan. 505, 508, 219 P.2d 442 (1950) (observing section 10 rights "are mere personal privileges which may be waived at the option of the defendant in a criminal proceeding"). This provision in section 10 allows a defendant to assert their right to be tried in the county where the crime was committed. 16 Kan. at 97. In this way, it "operates indirectly as a limitation on venue." *State v. Criqui*, 105 Kan. 716, 720, 185 P. 1063 (1919). That is, section 10 addresses where the crime can be prosecuted, not whether Kansas courts have subject matter jurisdiction over the crime itself.

We acknowledge our caselaw has imprecisely used the terms venue and jurisdiction. The confusion between proper venue and a court's "jurisdiction" began in *State v. Knapp*, 40 Kan. 148, 19 P. 728 (1888). There, defendants were charged with first-degree murder in Wichita County. They requested a venue change to another county in the same judicial district, but the State objected. Ultimately, the trial was moved to Barton County, in a separate judicial district, over the defendants' objection. The

17

defendants then moved to dismiss the case because the Barton County court did not have "jurisdiction." The court framed the issue as follows: "Did the district court of Barton county have jurisdiction to try the defendants and pronounce judgment in the cause?" *Knapp*, 40 Kan. at 149. The court concluded it did not.

In the intervening years, our court has often repeated this conceptual confusion. See, e.g., *Hillard*, 315 Kan. 732, Syl. ¶ 18 ("Kansas courts treat venue as a jurisdictional matter in criminal cases."); *State v. Kendall*, 300 Kan. 515, 530, 331 P.3d 763 (2014) ("Because venue is jurisdictional and implicates the district court's subject matter jurisdiction, our standard of review is de novo."); *State v. Myatt*, 237 Kan. 17, 30, 697 P.2d 836 (1985) ("The venue of an offense is jurisdictional."); *State v. Moore*, 226 Kan. 747, 750, 602 P.2d 1359 (1979) ("In Kansas, venue of an offense is jurisdictional, but the cases do not require that venue be proved by specific questions and answers that the offense occurred in a particular county."); *State v. Griffin*, 210 Kan. 729, 731, 504 P.2d 150 (1972) ("This court has recognized on many occasions that the venue of an offense is jurisdictional, and it must be proved to establish the jurisdiction of the court.").

But we clarified in *Dunn*, a court's subject matter jurisdiction is set by the Kansas Constitution and refined by the Legislature through statute. Procedural questions of venue, on the other hand, arise through statute and are indirectly limited by section 10's vicinage right. So even if properly raised in the district court, section 10's vicinage right does not undermine a district court's subject matter jurisdiction, which is rooted elsewhere in our founding document. Thus, Barnes' argument that his section 10 vicinage right deprived the court of subject matter jurisdiction is incorrect as a matter of law. Because Barnes' unpreserved argument does not impact subject matter jurisdiction—and because we decline to extend a discretionary exception to our usual preservation requirements—we need not address whether K.S.A. 21-5106(b) violates section 10.

18

*Barnes' pro se subject matter jurisdiction claims are unpersuasive.*

Barnes also argues, in his pro se brief, that K.S.A. 2020 Supp. 21-5106 did not apply because the tampering with an electronic monitoring device charge was not committed wholly or partly within Kansas. Because of this, his argument goes, the State failed to invoke the district court's subject matter jurisdiction because the charging document did not state "the essential facts constituting the crime charged," pursuant to K.S.A. 22-3201(b). See *Dunn*, 304 Kan. at 811-12 ("A Kansas charging document should be regarded as sufficient now . . . when it has alleged facts that would establish the defendant's commission of a crime recognized in Kansas."). But since the prosecution was appropriate under K.S.A. 21-5106, a Kansas district court could try the tampering charge, and the State's charging document properly cited the court's subject matter jurisdiction to do so. *Dunn*, 304 Kan. at 811.

Barnes also argues the district court lost subject matter jurisdiction when it allowed the State to orally amend the complaint at Barnes' preliminary hearing to add a stalking charge. This claim, however, misunderstands subject matter jurisdiction. As we noted in *Dunn*, the Kansas Constitution—not charging documents—confers subject matter jurisdiction. *Dunn*, 304 Kan. at 811. Regardless, the stalking charge was later dismissed.

Barnes further suggests he was prejudiced "because the amendments caused the appellant to be bound over for trial when there was otherwise a lack of probable cause to do so." But the district court still had probable cause to bind Barnes over on the other charges against him. This probable cause decision was based on extensive evidence supporting the charges outlined in the original charging document. See *State v. Washington*, 293 Kan. 732, 734, 268 P.3d 475 (2012) (quoting *State v. Berg,* 270 Kan. 237, 238, 13 P.3d 914 [2000]) ("'Probable cause at a preliminary examination signifies

19

evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.'"). Barnes' pro se jurisdictional arguments are without merit.

*The prosecutor's statements in closing argument were not error.*

Barnes claims, through counsel, the prosecutor committed prosecutorial error in closing arguments by claiming the premeditation element of its premeditated murder charge was undisputed. In his pro se brief, Barnes also claims the prosecutor erred seven other times in closing by misrepresenting the State's evidence, offering their opinion, and making comments aimed at inflaming the jury's passion.

*Preservation is not required—we decline the State's invitation to overrule precedent.*

A contemporaneous objection is not required to preserve claims of prosecutorial error for appellate review. *State v. Timley*, 311 Kan. 944, 949, 469 P.3d 54 (2020).

The State asks us to overrule this precedent. But it fails to convince us our "plain error rule" for prosecutorial statements during closing arguments is erroneous or no longer sound. See *State v. Moeller*, 318 Kan. 860, 864, 549 P.3d 1106 (2024) (outlining the stare decisis test). Thus, "we will review a claim of prosecutorial error based on comments made during voir dire, opening statement, or closing argument even in the absence of a contemporaneous objection. We may, however, figure the presence or absence of an objection into our analysis of the alleged error." *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

20

*Standard of Review*

We apply a two-step framework when reviewing claims of prosecutorial error. First, we consider whether the prosecutor exceeded the wide latitude prosecutors are given to conduct the State's case in a manner that does not offend a defendant's constitutional right to a fair trial. *State v. King*, 308 Kan. 16, 30, 417 P.3d 1073 (2018). We do not consider any statement in isolation, but look to the statement's context to determine whether error occurred. *Timley*, 311 Kan. at 949-50.

Next, if error is found, the State must show beyond a reasonable doubt the error did not affect the outcome in light of the entire record, i.e., "there is no reasonable possibility that the error contributed to the verdict." *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021); *State v. King*, 308 Kan. 16, 30, 417 P.3d 1073 (2018). We may consider the district court's jury instructions and the strength of the evidence against the defendant in determining whether any prosecutorial error is harmless. *Blevins*, 313 Kan. at 437. The strength of the evidence may inform this inquiry but should not be the primary focus; prejudice may be found even in strong cases. *State v. Sherman*, 305 Kan. 88, 111, 378 P.3d 1060 (2016) (citing *United State v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240, 60 S. Ct. 811, 84 L. Ed. 1129 [1940]).

*The prosecutor did not commit error in their comments.*

Through counsel, and pro se, Barnes asserts the prosecutor erred in making several comments during closing arguments.

1.  Comment that the premeditation element was "undisputed."

21

Barnes' first claim of prosecutorial error arises from the following remarks:

"The defendant intentionally killed Jessica Leigh Smith, the killing was done with premeditation and it occurred on July 5th of 2020 in Johnson County, Kansas. There are some of these that no one disputes. Jessica Smith was murdered on July 5th of 2020 in Johnson County, Kansas. It was certainly intentional. We know that. And it was definitely premeditated. There is no doubt about that.

"*There is only one element that we are disagreeing with here, the defendant*. So we will talk about that here in just a second.

"Count number 2 is aggravated burglary. The defendant entered or remained in a dwelling. We know [] is a house. That is where she lived. He did so without lawful authority. He kicked in the back door. *Did so with the intent to commit first degree premeditated murder. Yes*. At the time there was a human in the house. There is no dispute that there were three people in the house when the back door was kicked or shouldered in. And it occurred on July 5th, 2020, in Johnson County, Kansas." (Emphases added.)

Barnes argues the prosecutor "misrepresented that the premeditation element . . . was undisputed" because "[Barnes] never stipulated that [Smith's] killing was premeditated." Barnes claims that this misstatement "discouraged jurors from independently assessing whether trial evidence supported a beyond a reasonable doubt finding that [Barnes] committed a *premeditated* killing."

But Barnes takes the prosecutor's statements out of context. Rather than erroneously telling the jury that the matter of premeditation was settled, their remarks instead accurately framed the issue on which the parties would later focus: the killers' *identity* as "the big disagreement in this case."

22

The State's framing was well-founded. Barnes' trial counsel's entire closing argument centered on the claim that Barnes was not Smith's killer. Even in discussing an alternate suspect, Barnes' counsel never suggested that Smith's killing was not premeditated.

Barnes' counsel's emphasis on identity, not intent, was plainly strategic: the evidence for intentional, premeditated murder was overwhelming, as the prosecutor repeatedly emphasized—and as we will discuss below. Far from simply treating the question of premeditation as a fait accompli, the prosecutor emphasized the preparations necessary for—and the hatred underpinning—Barnes' plan to disregard house arrest and murder Smith while leaving what he thought to be no trace of his identity at the crime scene, and then return home before anyone was the wiser. And to the extent that Barnes' counsel offered *no argument* on premeditation, the prosecutor's comment that they were not "disagreeing" is an accurate framing of the defense's trial strategy. We find no error here.

2. "[W]e know [the GPS ankle bracelet] was tampered with over in Missouri."

Here, Barnes claims, pro se, that because "[n]o one testified to any tampering of the . . . GPS bracelet," the prosecutor's "comment is facts not in evidence." See *State v. Chandler*, 307 Kan. 657, 679-80, 414 P.3d 713 (2018) (error for a prosecutor to argue facts outside the evidence).

Barnes' argument both takes the prosecutor's comment out of context and misunderstands the nature and purpose of closing arguments. First, the prosecutor was not suggesting it was uncontroverted that the bracelet had been tampered with, but that it was uncontroverted the act *occurred in Missouri*:

23

"There is a lot of disagreement about [the tampering count]. We will come to that here in a moment. When it comes to jurisdiction of tampering, because it says that count occurred in Johnson County, Kansas, that might be a little—sound a little confusing *because we know that was tampered with over in Missouri*. But we have a statute in Kansas that addresses this specifically. It is a crime happens here in Kansas if the crime occurs partly in this state." (Emphasis added.)

Nor did the prosecutor simply leave the assertion that the bracelet "was tampered with" as if it was undisputed. Later in argument, the prosecutor spelled out the evidence supporting the claim that the bracelet was tampered with. In doing so, the prosecutor clarified that:

"[T]he State and the defense completely agree on this one fact. *His House Arrest bracelet is 100 percent at his dad's house in Missouri*. But his ankle isn't in it. That is what that evidence shows. That is what Doug Bell testified to you. The House Arrest bracelet has been tampered with. It has a pry mark in the chip." (Emphasis added.)

Thus, the prosecutor's remarks are fair comments on the evidence. Bell's testimony supports the prosecutor's assertion that the bracelet was tampered with. The prosecutor's remarks were not error.

3. "He is casing her house two days before the murder."

Barnes next claims "the prosecutor prejudicially led the jury to believe that the appellant was in the victim['s] neighborhood two days before she was murdered" by stating "he is [casing] her house two days before the murder." Barnes points out that "there is absolutely no evidence in the record that [Barnes] was ever anywhere near the victim['s] residence on this day."

The prosecutor's comment that Barnes was "casing" Smith's house represents an inference drawn from another inference, sometimes referred to as inference stacking. The evidence did not show that Barnes was *going* to Smith's house when his car broke down, much less that he was heading towards it with intent to "case" it. But inference stacking only matters insofar as a "conviction cannot be sustained by 'a presumption based upon other presumptions.'" *State v. Colson*, 312 Kan. 739, 750, 480 P.3d 167 (2021). Here, the prosecutor's remarks had little to do with the elements of Barnes' convictions; as Barnes' counsel pointed out, the State did not charge Barnes with stalking.

4. "There is DNA evidence that puts him there."
5. "He has got the murder weapon in his room."
6. Rebuttal comment: "He killed her. . . . He is the one who killed her."
7. Rebuttal comment: "How else do you know that this is Clyde Barnes who did this? Because nobody else . . . had a reason to do this to Jessica Smith. Nobody else hated her this much . . . ."
8. "He thought he could fool you by taking off his house arrest bracelet and leaving it at home."

In comments 4 through 8, Barnes alleges prosecutorial error based on what he describes as the prosecutor misstating evidence, stating facts not in evidence, or expressing an opinion. But in all these instances, we conclude the prosecutor's statements were fair commentary on the evidence. No error.

*The district court did not err by admitting one antemortem photograph and five graphic postmortem photographs at trial.*

Barnes challenges the district court's decision to admit six photographs at trial. He argues State's Exhibits 14-16, 98, 101, and 118 were unduly prejudicial with little to no probative value. He does not challenge the photographs' relevancy.

*Standard of Review*

The admission of even relevant evidence may still give rise to error if the evidence's "probative value is substantially outweighed by the risk of undue prejudice." *State v. D.W.*, 318 Kan. 575, 580, 545 P.3d 26 (2024); see K.S.A. 60-445. We review a district court's decision to admit relevant, prejudicial evidence for abuse of discretion. See, e.g., *State v. Thurber*, 308 Kan. 140, 203, 420 P.3d 389 (2018) (antemortem photographs); *State v. Baker*, 287 Kan. 345, 363, 197 P.3d 421 (2008) (postmortem photographs).

A district court abuses its discretion "by (1) adopting a ruling no reasonable person would make, (2) making a legal error or reaching a legal conclusion not supported by factual findings, or (3) reaching a factual finding not supported by substantial competent evidence." *State v. Alfaro-Valleda*, 314 Kan. 526, 533-34, 502 P.3d 66 (2022). In the context of photographs,

> "'An abuse of discretion has occurred when the admitted photographs were unduly repetitious and cumulative or their introduction was solely for the purpose of prejudice. The admission of photographs in a murder case has rarely been held to be an abuse of discretion.

> "'Photographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a murder case. Photographs which are relevant and material in

26

assisting the jury's understanding of medical testimony are admissible. Specifically, photographs which aid a pathologist in explaining the cause of death are admissible. Photographs used to prove the manner of death and the violent nature of the crime are relevant and admissible.' [Citations omitted.]" *State v. Green*, 274 Kan. 145, 147, 48 P.3d 1276 (2002).

*The Photographs*

Barnes directs us to six photographs:  three crime scene photographs, two autopsy photographs, and one identification photograph depicting Smith as she appeared while alive. Specifically:

- Exhibit 14 depicts Smith's body lying on the kitchen floor in a large pool of blood. While some of Smith's injuries can be seen—including what appears to be brain matter on the floor—the photograph is not a closeup.
- Exhibit 15 was taken directly over Smith as she lay on the kitchen floor. The injuries to her head, face, and throat can be seen clearly, as can what appears to be brain matter on the floor behind her.
- Exhibit 16 was taken just above the stairs leading down from the kitchen and depicts the blood leading from Smith's body—which lies in the upper right-hand corner, along with what appears to be brain matter on the floor—toward some stairs.
- Exhibit 98 is an autopsy photograph taken from above and to the right. It depicts Smith's nude body lying on a table in the morgue. Much of the blood that was present in the crime scene photos has been cleaned up. The injuries to Smith's head, face, and throat are clearly visible.
- Exhibit 101 is also an autopsy photograph. It was taken as a closeup on the injuries to Smith's head and face. It also depicts the wounds to her throat in detail.
- Exhibit 118 depicts Smith and D.S. together, as Smith appeared when she was alive. D.S. appears to be a teenager in the photograph, which is undated.

*Additional Facts*

At a pretrial hearing, Barnes' counsel objected to a proposed photograph of D.S. and Smith together. The prosecutor argued that it was "common practice in every murder case" to show the victim as they appeared in life, "[b]ut it's particularly important in this case because the victim was hideously disfigured" by the wounds that killed her. The district court overruled Barnes' objection. Later, at trial, the court admitted the photograph of D.S. and Smith together over Barnes' renewed objection.

Barnes also objected to various postmortem crime scene photos that showed Smith's body, including the massive, traumatic injuries to her head. In discussing State's exhibits 14—which showed Smith's body as it lay on her kitchen floor—Barnes' counsel argued that the photo was "so prejudicial that it will cause the jury not to be able to listen and to appropriately evaluate the evidence." The district court overruled the objection, opining that "based on the limited number of photographs the prosecutor is going to present, that it is necessary for the jury to see those." Barnes' counsel extended the same objections to exhibits 15 and 16, with the same result.

As to the autopsy photos, Barnes' counsel commented that the State's exhibits "101 and 98 . . . are, in my mind, as gruesome as can be." He suggested the photographs' prejudicial nature outweighed any evidentiary value. The prosecutor responded that exhibit 98 "is an overall body picture . . . which is a standard autopsy picture" and that 101 "is cleaned up and shows a fatal injury." The court ruled that it believed "there is a limited number of photographs, and I believe they may be difficult to view, but I do believe that they assist in showing cause of death." The court thus admitted exhibits 98 and 101.

*Preservation*

Barnes' counsel objected to the postmortem photos—exhibits 14, 15, 16, 98, and 101—because they were gruesome and unduly prejudicial. Barnes reprises this argument on direct appeal, which is preserved for review.

But the State argues Barnes' challenge to exhibit 118, the antemortem identification photo, is not preserved for review. The State contends Barnes' counsel only objected to the relevancy of the exhibit 118, not its prejudicial effect. See *State v. Robinson*, 306 Kan. 1012, 1028-29, 399 P.3d 194 (2017) ("This court does not allow parties 'to object to the introduction of evidence on one ground at trial and then assert another ground on appeal.'") (quoting *State v. Race*, 293 Kan. 69, 78, 259 P.3d 707 [2011]).

Barnes' counsel argued that the photograph "doesn't serve any legitimate element, evidence, argument, question." In response, the prosecutor argued, in part, that the photograph would not be prejudicial. The district court, therefore, had prejudice in mind when it overruled Barnes' objection. We find that Barnes' challenge to exhibit 118 is preserved for review.

*Antemortem Photograph:  State's Exhibit 118*

Barnes argues that, by depicting Smith together with D.S., the State's photograph "primarily served the purpose of eliciting sympathy for the deceased's surviving daughter."

The prosecutor introduced exhibit 118 on the morning of the second day of trial—during D.S.'s testimony—and took it down shortly thereafter. It did not come with any

inflammatory personal details. The prosecutor only asked D.S. who the picture depicted and whether it was a fair and accurate depiction of Smith while she was alive. This treatment appears well in line with what we have approved in our precedent. See, e.g., *State v. Hebert*, 277 Kan. 61, 103, 82 P.3d 470 (2004) (no error in admitting photograph of victim which "was displayed one time early in the trial and was not accompanied by inflammatory personal details"). We find the court did not abuse its discretion in allowing the antemortem photo into evidence.

### Postmortem Photographs:  State's Exhibits 14-16, 98, 101

Barnes also argues that five photographs showing Smith's body after death were unduly prejudicial. Barnes acknowledges that it has been nearly 50 years since we found a gruesome photo should not have been admitted at trial. *State v. Boyd*, 216 Kan. 373, 377-78, 532 P.2d 1064 (1975); *State v. Clark*, 218 Kan. 18, 24, 542 P.2d 291 (1975). Still, Barnes claims these five photographs were "just as unspeakably horrific as the one described in" *Boyd.*

But *Boyd* is distinguishable. Unlike this case, the prosecutor in *Boyd* introduced 14 photographs of *just* the autopsy. *Boyd*, 216 Kan. at 377. We acknowledged that "[s]everal of the photographs show the angle at which the deceased's body was penetrated by a sharp instrument and would seem to be reasonably necessary to explain the testimony of the state's medical witness." 216 Kan. at 377. But we focused on one autopsy photograph that "showed the body of the deceased cut open from chin to groin and laid out like a disemboweled beef in a packing plant. A flap of chest skin partially covers the deceased's face and the chest and abdominal organs of the deceased are presented in full view." 216 Kan. at 377-78. In other words, rather than presenting evidence documenting the victim's wounds as they were—the victim had been stabbed multiple times, but not disemboweled or split open, as the photograph depicted—the prosecution in *Boyd* introduced what was

30

essentially a graphic medical photograph with little probative value. We expressed concern that the State was "offering repetitious exhibits to prove the same point"— especially the "gruesome and repulsive" autopsy photograph mentioned above. 216 Kan. at 377-78. We concluded the district court abused its discretion by allowing some of those photographs into evidence.

In contrast, the five objected-to photos here did not depict the results of a medical procedure. Smith's body had been cleaned of some of the blood in the autopsy photographs, but her injuries did not come from a coroner's knife, as in *Boyd*. See *Green*, 274 Kan. at 148 ("Here, the many injuries to the body depicted in the slides are the result of what the victim's killer did to her.").

And the photographs were not repetitious. The three crime scene photos—exhibits 14-16—were taken from different perspectives, variously illustrating the victim's placement on the kitchen floor, the bloody footprints, blood spatter on walls and appliances, and the severity of her injuries. These photographs helped corroborate witness testimony about the crime scene. See *State v. Verge*, 272 Kan. 501, 515, 34 P.3d 449 (2001) ("The positioning of the bodies, blood stain patterns, and the wounds inflicted all contributed to the State's establishing the element of premeditation."); *State v. Sutton*, 256 Kan. 913, 921, 889 P.2d 755 (1995) ("In the present case, the photographs taken where the body was found were introduced to corroborate the testimony of a law enforcement officer who described the appearance of the body, the clothing, and the surrounding ground.").

One autopsy photo—exhibit 101—focused on the victim's head and neck wounds. The other—exhibit 98—was a full-body photograph that illustrated the victim's wounds from a different angle. Each photograph provided unique information to the jury. See *State v. Showalter*, 318 Kan. 338, 351, 543 P.3d 508 (2024) ("We have long recognized

31

photographs can depict injuries in a way that a coroner's testimony cannot."); *State v. Dupree*, 304 Kan. 43, 65, 371 P.3d 862 (2016) (finding no abuse of discretion regarding multiple autopsy photos because "each of the photographs corroborated the coroner's testimony by showing [victim's] body at different angles and distances").

And the State built the disfiguring, identity-erasing nature of Smith's wounds into its theory that Barnes was Smith's killer. The prosecutor argued that only Barnes "hated her this much" because "[s]he is responsible for everything bad in his life." Thus, only Barnes would keep "swinging and swinging again and again and again" after Smith had already been killed "to destroy her face . . . to disfigure her." The prosecutor thereby wove the nature of the injuries into a proposed narrative of motive:  disfigurement and identity erasure based on absolute hatred. And to make that case, the prosecutor would have been hard pressed to rely on testimony alone. Shocking as the photographs of Smith's body may be, their relation to the State's theory was significant. And, as we have often acknowledged, "Gruesome crimes result in gruesome photographs." See *Green*, 274 Kan. at 148 (no abuse of discretion in admission of photographs depicting the results of an "incredibly violent and gruesome homicide" where "[a]t least 11 massive blows to the head were inflicted and did horrific damage to the face and skull" and "near decapitation resulted from multiple sawing motions from a sharp object"—despite a juror fainting during the presentation).

Thus, while the photographs were undoubtedly disturbing, we conclude the district court did not abuse its discretion in admitting the challenged photographs.

*Barnes' premeditation jury instruction was not erroneous.*

Barnes argues that the PIK's definition of "premeditation" misstates the law and, thus, constitutes clear error.

32

*Standard of Review*

We apply a multi-step analysis when presented with a claim of error based on jury instructions.

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)]." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

"The first element of this analysis ultimately affects the last one 'in that whether a party has preserved an issue for review will have an impact on the standard by which we determine whether an error is reversible.'" *State v. Ross*, 310 Kan. 216, 223, 445 P.3d 726 (2019) (quoting *State v. Barber*, 302 Kan. 367, 377, 353 P.3d 1108 [2015]). When a defendant does not object to a jury instruction:

"we apply the clear error standard mandated by K.S.A. 2017 Supp. 22-3414(3). Under that standard, an appellate court assesses whether it is 'firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.' [The defendant] has the burden to establish reversibility, and in examining whether he has met that burden we make a de novo determination based on the entire record. [Citations omitted.]" *State v. Williams*, 308 Kan. 1439, 1451, 430 P.3d 448 (2018).

*Discussion*

Barnes did not object to the premeditation instruction. We therefore review his claim for clear error. His argument addresses a portion of Instruction No. 11, which read, in relevant part:

> "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept requires more than the instantaneous, intentional act of taking another's life. (PIK 4th 54.150)"

Barnes focuses on the phrase "in other words, to have formed the design or intent to kill before the act." Although this language comes from the PIK, he argues it "conveys, wrongly, that premeditation is a *merely* temporal consideration, and that intent formed before an act *necessarily* constitutes premeditation." See *State v. Stanley*, 312 Kan. 557, 573, 478 P.3d 324 (2020) ("In other words, what distinguishes premeditation from intent is both a temporal element [time] and a cognitive element [consideration].").

Instead, Barnes argues that the PIK should be revised as follows:

> "Premeditation means to have thought the matter over beforehand, ~~in other words, to have formed the design or intent to kill before the act~~. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life. *Premeditation requires a period, however brief, of thoughtful, conscious reflection and pondering—done before the final act of killing—that is sufficient to allow the actor to change his or her mind and abandon his or her previous impulsive intentions.*"

Barnes takes this language from *Stanley*. 312 Kan. at 574. But since *Stanley*, we have considered whether it is error if a district court does not give this expanded

34

instruction. In these cases, we concluded it was not error because the PIK alone, which Barnes received, was not misleading and accurately explained the law of premeditation. *State v. Dotson*, 319 Kan. 32, 51-52, 551 P.3d 1272 (2024); *State v. Coleman*, 318 Kan. 296, 313-14, 543 P.3d 61 (2024); *State v. Hilyard*, 316 Kan. 326, 335, 515 P.3d 267 (2022). Despite Barnes' urging, we see no reason to depart from these cases. The district court's use of the standard PIK instruction was not error, let alone clear error.

*The district court's decision not to instruct the jury on intentional second-degree murder was not clear error.*

Barnes next argues the district court committed clear error by not instructing the jury on intentional second-degree murder as a lesser included offense of premeditated first-degree murder.

*Invited Error*

The State argues Barnes invited any error on this issue. We have explained that "[t]he invited-error doctrine precludes a party who has led the district court into error from complaining of that error on appeal." *State v. Slusser*, 317 Kan. 174, 179, 527 P.3d 565 (2023). We have unlimited review over whether the invited-error doctrine applies. 317 Kan. at 179.

At the jury instructions conference, Barnes' counsel said the following:

"I do note that when I looked at the instructions, there are lesser-included. Now, I talked with my client about this before. We had a video, Zoom, whatever you call it, conference yesterday. He was at New Century. I was in my office. And we talked quite a bit about whether or not on his behalf I should recommend any lesser-included. We went over why we should, why we shouldn't. We came to the agreement Mr. Barnes doesn't want me to

35

request lessers. I'm not so sure there are anyhow, but he has asked me to not ask for any lesser-included."

After the prosecutor responded, the court commented:

"As far as the lesser-included, the Kansas Supreme Court has put the onus on the Court rather than the lawyers whether or not you request it or not on a lesser-included, but the Court isn't going to give a lesser-included and I don't believe the evidence comports with the giving of a lesser-included in this case."

The district court did not give an intentional second-degree murder instruction.

Based on this exchange, the State argues that since Barnes "affirmatively requested the jury *not* be instructed on any lesser-included offenses," Barnes should be "precluded from claiming any error."

We have repeatedly refined our invited-error analysis in recent years, with several marginal variations in fact pattern. See, e.g., *State v. Martinez,* 317 Kan. 151, 167-69, 527 P.3d 531 (2023); *State v. Roberts*, 314 Kan. 835, 845-47, 503 P.3d 227 (2022); *State v. Douglas*, 313 Kan. 704, 707, 490 P.3d 34 (2021). "The ultimate question is whether the record reflects the defense's action in fact induced the court to make the claimed error." *Douglas*, 313 Kan. at 708.

The comments made by Barnes' counsel are nearly identical to the comments in *Douglas.* There, the court asked defense counsel whether they would be requesting any lesser included offense instructions. Counsel replied: "I know that I am not requesting any lesser included offenses and indeed there may not be any applicable ones either." *Douglas*, 313 Kan. at 707. The court agreed. Here, counsel explained he was not requesting any lesser included instructions, and that he was unsure whether they were

36

even appropriate. The court explained it was not giving a lesser-included offense instruction because doing so was unsupported by the evidence.

As in *Douglas*, we find that Barnes' counsel's statement did not induce the district court to omit an intentional second-degree murder instruction. *Douglas*, 313 Kan. at 709. The court's comments instead show it made its decision independent of counsel's statement. Because there was no causal connection between counsel's statement and the court's instruction decision, the invited error doctrine does not apply. See *Martinez,* 317 Kan. at 167-69; *Roberts*, 314 Kan. at 847.

*Merits*

K.S.A. 22-3414(3) provides: "In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime as provided in subsection (b) of K.S.A. 21-5109, and amendments thereto, the judge shall instruct the jury as to the crime charged and any such lesser included crime." Jury instructions must be both factually and legally appropriate. *State v. Flack*, 318 Kan. 79, 127, 541 P.3d 717 (2024).

Both parties agree that an intentional second-degree murder instruction would have been legally appropriate. *State v. Gray*, 311 Kan. 164, 173, 459 P.3d 165 (2020). Barnes also argues it was factually appropriate. We assume without deciding that the instruction was factually appropriate and turn to the harmless error analysis. *Douglas*, 313 Kan. at 710; *State v. Gray*, 311 Kan. 164, 174, 459 P.3d 165 (2020); *State v. Becker*, 311 Kan. 176, 184, 459 P.3d 173 (2020); *State v. Ross*, 310 Kan. 216, 223, 445 P.3d 726 (2019); *State v. Louis*, 305 Kan. 453, 459, 384 P.3d 1 (2016).

"Premeditation may be shown by circumstantial evidence, provided inferences are reasonable. Our caselaw identifies five factors to consider when deciding whether circumstantial evidence gives rise to an inference of premeditation: '(1) the nature of the

37

weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless.' Inferences reasonably drawn are not driven by the number of factors present in a particular case, because in some cases one factor alone may be compelling evidence of premeditation. [Citations omitted.]" *State v. Hilyard*, 316 Kan. 326, 331, 515 P.3d 267 (2022).

The State presented significant evidence supporting premeditation. Barnes' angry, threatening Facebook rant, his deliberate choices in clothing, mask, and gloves to obscure his identity, his actions in driving both to Smith's residence and then repeatedly circling the block, and the many lethal blows he rained down upon her with a mattock he brought with him—including at least some while she was helpless and on the ground—without provocation, after kicking in her back door at 3 a.m., all strongly support the jury's finding of premeditation.

The State, therefore, presented overwhelming evidence of premeditation at Barnes' trial. Because of this, we conclude failing to provide an intentional second-degree murder instruction was not clear error. See *Douglas*, 313 Kan. at 710 ("When there is overwhelming evidence of premeditation, a defendant will fail to firmly convince an appellate court that a jury would have found the defendant guilty of second-degree intentional murder if the lesser included instruction had been offered.").

Finally, the State asks us to change our analysis for jury instruction errors. But the State provides no compelling argument that our current analysis was originally erroneous or is no longer sound because of changing conditions and more good than harm will come from changing the law. *Moeller*, 318 Kan. at 864. We therefore reject the State's request.

*Sufficient evidence supported Barnes' conviction for tampering with electronic monitoring equipment.*

Barnes argues there was insufficient evidence to support his conviction of unlawfully tampering with electronic monitoring equipment in violation of K.S.A. 21-6322.

*Standard of Review*

In a sufficiency analysis, we review all the evidence in a light most favorable to the State and determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Zeiner*, 316 Kan. 346, 350, 515 P.3d 736 (2022). We generally do not reweigh the evidence or make credibility determinations. 316 Kan. at 350.

"A reviewing court need only look to the evidence in favor of the verdict to determine whether the essential elements of a charge are sustained." *Zeiner*, 316 Kan. at 350. "Sufficient circumstantial evidence does not need to exclude every other reasonable conclusion to support a conviction." 316 Kan. at 350. And "even the gravest offense can be based entirely on circumstantial evidence." 316 Kan. at 350.

*Discussion*

The jury convicted Barnes of one count of unlawfully tampering with electronic monitoring equipment. K.S.A. 21-6322(a) defines the crime:

"(a) Unlawfully tampering with electronic monitoring equipment is, knowingly and without authorization, removing, disabling, altering, tampering with, damaging or

39

destroying any electronic monitoring equipment used pursuant to court ordered supervision or as a condition of post-release supervision or parole."

The jury instructions broke the crime into three elements:

"1. The defendant knowingly and without authorization removed or tampered with electronic monitoring equipment.

"2. The electronic monitoring equipment was being used as a condition of court-ordered supervision.

"3. This act occurred on or about the 5th day of July, 2020 in Johnson County, Kansas. (PIK 4th 63.131)."

Barnes argues this charge "consist[s] of layers of assumptions and inferences." He notes that house arrest officers claim the bracelet set off alarms, and from that they assumed the bracelet was removed. This appears to be a challenge of the State's evidence supporting the first element: that Barnes removed or tampered with the bracelet.

At trial, Doug Bell, a house arrest supervisor for the Johnson County Department of Corrections, testified for the State. His testimony provided evidence that: (1) Barnes' bracelet issued a strap tamper alert at 1:15 a.m. on July 5, meaning the strap had been opened; (2) Barnes' bracelet also issued a proximity tamper alert at 1:15 a.m. on July 5, meaning there was no ankle in the bracelet; (3) Barnes' bracelet showed signs of physical tampering; (4) the strap tamper alert ended at 1:17 a.m. but the proximity alert did not; (5) the external battery was placed on the bracelet at 1:17 a.m.; (6) the battery loudly beeped for two minutes at 2:19 a.m. with no response; (7) the battery was removed from the bracelet at 5:01 a.m. and then everything was reset one minute later.

This evidence paints the picture of Barnes physically tampering with the bracelet to remove it at 1:15 a.m., closing the strap without his ankle inside two minutes later, placing the battery on the bracelet, not turning off the two-minute-long beeping alert at

2:19 a.m., and then putting the bracelet back on at 5:02 a.m. In short, the State presented both physical and electronic evidence suggesting Barnes removed his bracelet.

Barnes also argues his conviction required inference stacking, his conviction required impermissible speculation, and his sufficiency argument translates into violations of the Fourteenth Amendment's Due Process Clause and the Sixth Amendment's Confrontation Clause. But these claims are only incidentally briefed and are therefore waived. *State v. Gomez*, 290 Kan. 858, 866, 235 P.3d 1203 (2010). Accordingly, we conclude sufficient evidence supported Barnes' conviction.

*Cumulative error did not deny Barnes a fair trial.*

Finally, Barnes argues cumulative error prevented him from having a fair trial. But we only assumed without deciding that one error existed regarding the intentional second-degree murder instruction. "The cumulative-error doctrine does not apply when only one error has been identified." *Dotson*, 319 Kan. at 54. And at any rate, the omission did not constitute clear error, so we do not consider it when conducting a cumulative error analysis. *State v. Waldschmidt*, 318 Kan. 633, 662, 546 P.3d 716 (2024). The cumulative error doctrine does not provide Barnes with relief. And finding no other errors that require reversal, we affirm Barnes' convictions and sentence.

Affirmed.